**In re NATIONAL GYPSUM COMPANY, a Delaware Corporation, Aancor Holdings, Inc., a Delaware Corporation.**

**Civ. A. No. 3–91–1653–H.**
**Bankruptcy Nos. BK390–37214–SAF–11, BK390–37213–SAF–11.**

United States District Court,
N.D. Texas,
Dallas Division.

Feb. 12, 1992.

Marvin Collins, U.S. Atty., Rebecca Gregory, Asst. U.S. Atty., Dallas, Tex., David L. Dain, U.S. Dept. of Justice, Environment & Natural Resources Div., John Wheeler, Enforcement LE–134S, U.S. E.P.A., Anna Wolgast, Jeffery K. Gordon, Peter E. Jaffe, U.S. Dept. of Justice, Washington, D.C., for E.P.A., plaintiff.

David L. Dain, U.S. Dept. of Justice, Enviroment & Natural Resources Div., Carolyn Dibona, Office of the Sol., Dept. of the Interior, Washington, D.C., for U.S. Dept. of Interior, plaintiff.

Boe W. Martin, Keith W. Harvey, Johnson & Gibbs, Dallas, Tex., James W. Moorman, David F. Williams, Cadwalader Wickersham & Taft, Washington, D.C., Rebeca O. Beasley, National Gypsum Co., Dallas, Tex., for National Gypsum Co., defendant.

Barbara J. Houser, Leonard M. Parkins, Anne Marie Ferazzi, Sheinfeld Maley & Kay, Dallas, Tex., for Official Committee of Asbestos Claimants of Nat. Gypsum, movant.

## MEMORANDUM OPINION AND ORDER

SANDERS, Chief Judge.

There are before the Court two sets of motions that will be considered jointly. The first set of motions consists of:

1. United States' Motion for Legal Determination of Issues Raised in the Debtors' Objection, Motions and/or Counterclaims, filed October 28, 1991 ("U.S. Motion");

2. Debtors' Brief in Response to the United States' Motion for Legal Determination of Issues and Supporting Brief, filed November 29, 1991 ("Debtors' Response");

3. Statutory Bond and Trade Creditors' Committee Memorandum in Support of Debtors' Objections, Motions and/or Counterclaims, filed November 27, 1991 ("Committee Memorandum"); and

4. United States' Reply to Debtors' and Committee's Response to United States' Motion for Determination of Legal Issues, filed December 18, 1991 ("U.S. Reply").

The second set of motions consists of:

1. Debtors' Motion for Summary Judgment Concerning Discharge of any Environmental Liability for Sites Not Listed in the Government's Proof of Claim and supporting Memorandum, filed October 25, 1991 ("Debtors' Motion");

2. United States' Motion for Partial Dismissal of the Amended Counterclaim of Debtors and supporting Memorandum, and Memorandum Brief in Response to Debtors' Motion for Summary Judgment, filed November 12, 1991 ("U.S. Response");

3. Debtors' Memorandum in Opposition to Motion of the United States for Partial Dismissal of Debtors' Amended Counterclaim and in Reply to the United States' Memorandum in Response to Debtors' Motion for Summary Judgment, filed November 29, 1991 ("Debtors' Reply"); and

4. Reply of the United States in Further Support of its Motion for Partial Dismissal of Amended Complaint, filed December 17, 1991 ("U.S. Reply II").

### I. *Factual Summary*

National Gypsum Co. ("Gypsum"), along with its parent corporation, Aancor Holding Inc., (collectively "Debtors"), filed a voluntary petition for bankruptcy on October 28, 1990 under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* ("Code"). Since the petition date, Debtors have operated their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Code.

On May 29, 1991 the United States filed its Proof of Claim ("Proof of Claim") on behalf of the Environmental Protection

Agency ("EPA") and the Department of Interior ("DOI"). Pursuant to CERCLA,[1] the United States' Proof of Claim lists seven sites nationwide at which it alleges the Debtors generated or disposed of hazardous substances ("Listed Sites"). In addition, the United States reserves its right to assert that the Debtors are liable under CERCLA with respect to at least thirteen unlisted sites based on pre-petition conduct ("Unlisted Sites"). For a detailed discussion of the Proof of Claim, and United States' Listed and Unlisted Sites, refer to Section III, *infra.*

On August 2, 1991 the Debtors filed with the bankruptcy court an Objection to the Proof of Claim, a Motion to Estimate the United States' Claim and a Motion to Classify the United States' Claim. Debtors' motions raised a number of significant legal issues regarding the intersection of the Code and CERCLA.

On August 16, 1991 the United States filed a Motion for Withdrawal of Reference. On September 13, 1991 this Court granted the United States' Motion, withdrawing from bankruptcy court all matters pertaining to the Proof of Claim, and all Debtors' responses to such claim. *See* September 13, 1991 Memorandum Opinion and Order. 134 B.R. 188. The Court found that disposition of the Proof of Claim implicated the category of cases that requires substantial and material consideration of non-bankruptcy federal statutes, and warrants mandatory withdrawal of reference pursuant to 28 U.S.C. § 157(d). *See id.*

Once reference was withdrawn, the United States and the Debtors agreed on a schedule for the briefing of significant and controlling legal issues raised by the Proof of Claim, and more specifically, by the interaction of the Code and CERCLA. These legal issues are embodied in the two sets of motions before the Court: The United States' Motion for Legal Determination of Issues Raised in the Debtors' Objection, Motions and/or Counterclaims, and the Debtors' Motion for Summary Judgment

Concerning Discharge of any Environmental Liability for Sites not Listed in the United States' Proof of Claim.

Beyond setting a schedule for the briefing of the two sets of motions, the parties were unable to agree on a stipulated schedule for discovery and trial. As a result, on October 15 and 18, 1991 the United States and the Debtors filed, respectively, two separate proposed scheduling orders. The proposed scheduling orders placed before the Court for determination the order in which estimation and determination of liability of the United States claims' should be addressed.

On November 12, 1991 the Court granted Debtors' request for bifurcation of the proceedings into an estimation phase which precedes the liability phase; however, estimation of the Proof of Claim would occur no earlier than the disposition of the two sets of scheduled motions. *See* November 12, 1991 Memorandum Opinion and Order. The Court found that in view of the Court's mandatory withdrawal of reference, and in order to facilitate the administration of the bankruptcy proceedings, there existed no reason to depart in a case involving CERCLA from the well-established bankruptcy practice and policy favoring estimation of unliquidated claims prior to determination of liability. *See id.* At that time, the Court found that a potentially large portion of the United States' Proof of Claim was unliquidated. *See id.* at 5. The Court has not yet adopted a trial and discovery schedule.

## II. *Parties' Contentions*

The two sets of pleading raise the following controlling questions of law:

1. Whether future response costs and future natural resource damage costs at the Listed Sites are "claims" within the meaning of the Bankruptcy Code, subject to discharge;

2. Whether Debtors' environmental liabilities for the Unlisted Sites arising from pre-petition conduct are "claims"

---

**1.** CERCLA refers to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601–9675 (1989).

within the meaning of the Bankruptcy Code, subject to discharge;

3. Whether response costs incurred in connection with property presently owned by Debtors are entitled to administrative expense priority; and

4. Whether Debtors are jointly and severally liable for claims at the Listed sites.

The United States argues that future response costs and future natural resource damage costs at the Listed Sites are not claims subject to discharge; Debtors' liabilities at Unlisted Sites are not dischargeable claims; response costs incurred post bankruptcy at property owned by Debtors are entitled to administrative priority; and liability of Debtors for CERCLA claims is joint and several. The United States, however, contests the Court's jurisdiction to address Debtors' liability at the Unlisted Sites.

The Debtors argue, in contrast, that Debtors' potential liability for any future response costs or future natural resource damages at the Listed Sites constitute pre-petition claims subject to discharge; Debtors' environmental liabilities for the Unlisted Sites arising from pre-petition conduct are claims; response costs incurred post bankruptcy at property owned by the Debtors are general unsecured claims; and the Proof of Claim should be fixed at an amount reflecting Debtors' equitable share of liability. In addition, Debtors maintain that the Court has subject matter jurisdic-

tion to address Debtors' liability at the Unlisted Sites.

### III. *Proof of Claim: Listed/Unlisted Sites*

Upon filing for bankruptcy, the Debtors alerted the United States that they may be liable for recovery of cleanup costs at a number of Superfund sites. After preliminary investigation of the Debtors' potential responsibility for hazardous waste clean up, the United States, needing more time to complete its investigations, requested an extension in the bar date set by the bankruptcy court[2]. The Debtors and the United States identified over twenty sites at which there existed a potential for liability on the part of the Debtors.

By the extended bar date, May 29, 1991, the United States determined to file its Proof of Claim for Debtors' pre-petition conduct at only seven Superfund sites ("Listed Sites"). The United States, however, reserves its right to assert that the Debtors are liable under CERCLA with respect to at least thirteen unlisted sites based on pre-petition conduct ("Unlisted Sites").

#### A. Listed Sites[3]:

The United States Proof of Claim lists seven sites, all of which are on EPA's "National Priorities List[4]" ("NPL") of sites targeted for Superfund response. The Proof of Claim involves Debtors' liability on primarily three grounds: past response costs[5], future response costs[6] and natural

---

2. The bar date issued by the bankruptcy court initially required all creditors with pre-petition claims to file proof of claims by March 18, 1991. However, in response to the United States Motion for extension of time, the bankruptcy court granted the United States an additional 60 days to file its claim. Debtors, themselves, then filed an emergency motion, apparently at the request of the government, seeking to extend the bar date for an additional nine days, or until May 29, 1991, which was granted.

3. Although derived primarily from Debtors' pleadings, this section involves facts the Court understands to be undisputed; the United States has not challenged any of these factual presentations. However, since the purpose of the pleadings relating to the Listed Sites is solely determination of legal questions, the Court's reference to these facts should not be construed as binding determinations.

4. The NPL is intended to prioritize releases or threatened releases throughout the United States for the purpose of taking remedial action. *See* 42 U.S.C. § 9605(a)(8)(A). The criteria for establishing priorities is set by statute and takes into account the population at risk, the hazard potential of the substances, potential of contaminating drinking water supplies and ambient air, and potential for destruction of ecosystems, among a number of other factors. *See id.* As a matter of law, the NPL listing requires a preliminary finding by the EPA that a site poses a release or threat of release of a hazardous substance. *See id.* §§ 9605(a)(8)(A) & (B); *see also id.* § 9604(a)(1).

5. Section 104 of CERCLA authorizes the EPA to take "any ... response measure consistent with the national contingency plan which [EPA] deems necessary to protect the public health or

resource damages[7]. *See* 42 U.S.C. §§ 9607(a)(1), (2) and (3).

With respect to each of the seven Listed Sites[8], the United States has alleged that the Debtors arranged for the disposal of hazardous substances pre-petition; that a release or threat of release of a hazardous substance occurred or existed pre-petition; and that EPA first incurred response costs for each of these sites pre-petition. *See* Debtors' Appendix A, attached to Debtors' Response[9].

welfare or the environment" whenever "any hazardous substance is released or there is a substantial threat of such a release into the environment...." 42 U.S.C. § 9604(a). EPA selects an appropriate remedy and can either order the potentially responsible party to take the remedial action under Section 106(a), *see id.* § 9606(a); or take the remedial action itself, using so-called Superfund money, and seek reimbursement for such response costs under section 107(a), *see id.* § 9607(a). Response Costs include investigative, remedial, removal and governmental oversight costs under CERCLA. *See id.* § 9601(25).

6. The United States maintains that future response costs and future natural resource damages are not "claims" under the Code, and for this reason should not be included in the Proof of Claim for the purpose of dischargeability. However, the United States has contingently included future costs and damages for unliquidated damages in its Proof of Claim in case this Court finds such future costs to be "claims" subject to the bankruptcy bar date.

7. CERCLA provides that, in addition to cost recovery for response and cleanup actions, natural resource trustees may recover damages for injury to, destruction of, or loss of natural resources resulting from the discharge of oils or the release of hazardous substances, including the reasonable costs of assessing such injury, plus any prejudgment interest. *See* 42 U.S.C. § 9607(a)(4)(C).

8. The 7 Listed Sites consist of the Asbestos Dump Sites (Millington, New Jersey), the Salford Quarry facility (Montgomery County, Pennsylvania), the City Industries Site (Orlando, Florida), Yellow Water Road (Jacksonville, Florida), the Coakley Landfill (North Hampton, New Hampshire), H.O.D. Landfill (Antioch, Illinois), and Yeoman Creek Landfill (Waukegan, Illinois).

Response costs are alleged as to all seven Sites. Natural Resource damages are alleged only as to the Salford Quarry, the H.O.D. Landfill, the Yeoman Creek Landfill, and the Asbestos Dump Sites.

Some form of governmental action has been taken at each of the seven Listed Sites. Such action has taken the following varied forms, appearing often in combination, at any individual site: listing sites on NPL[10], notifying Debtors of their status as potentially responsible parties ("PRP"), Remedial Investigation and Feasibility Study[11], issuance of a Record of Decision[12], issuance of Administrative Consent Order[13], and incurrance of response costs[14]. *See id.*

9. Debtors' Appendix A, attached to its response to the U.S. Motion, presents in tabular form, information for each of the seven Listed Sites concerning Debtors' alleged disposal, the alleged release or threat of release, and alleged incurrence of response costs.

10. *See supra* note 4.

11. Once a site has been placed on the National Priorities List (following a preliminary assessment and public notice and comment), a Remedial Investigation and Feasibility Study is conducted "to determine the nature and extent of the threat presented by the release and to evaluate proposed remedies." 40 C.F.R. § 300.68(d); 42 U.S.C. § 9604(a).

12. After completion of the Remedial Investigation and Feasibility Study, EPA selects an appropriate remedy from among the range of alternatives considered for the site. *See* 40 C.F.R. 300.68(a)–(j). The remedial decision is based upon the administrative record developed during the Investigation and Study, and must satisfy the statutory cleanup standards, which include all "applicable" and "relevant and appropriate" federal state and local laws. *See* 42 U.S.C. § 9621(d). CERCLA requires EPA to publish notice of any proposed remedial plan and afford an opportunity for public comment before adopting the plan. *See id.* § 9617. EPA embodies its final remedy selection in a Record of Decision. *See* 40 C.F.R. § 300.68.

13. After EPA issues a Record of Decision, it can solicit or compel potentially responsible parties to perform the removal or remedial action. Section 106(a) of CERCLA authorizes EPA to issue an Administrative Order directing responsible parties to perform the EPA-selected remedy. *See* 42 U.S.C. § 9606. Additionally, CERCLA authorizes the Attorney General to seek judicial relief to compel responsible parties to perform the remedy. *See id.*

14. EPA may choose to implement a remedy for a site itself, using Superfund money. Section 107(a) of CERCLA authorizes EPA to seek reimbursement of Superfund money spent for the cleanups. *See* 42 U.S.C. § 9607(a). A cost re-

B. Unlisted Sites[15]:

There are at least thirteen sites [16] not listed in the Proof of Claim at which the United States has asserted that the Debtors are liable under CERCLA. With respect to each of these Unlisted Sites, the United States has alleged that the Debtors arranged for the disposal of hazardous substances pre-petition; that a release or threat of release of a hazardous substance occurred or existed pre-petition; and that EPA first incurred response costs for each of these sites pre-petition. *See* Debtors' Appendix A, attached to Debtors' Motion [17].

However, in addition to the thirteen Unlisted Sites, the EPA has knowledge of numerous other sites to which it believes the Debtors are linked through its CERCLIS computer database. EPA's CERCLIS computer database lists the sites under investigation for purposes of the Superfund program, identifying those sites with which the Debtors, their present or prior affiliated companies, are related. *See* Debtors' Appendix B, attached to Debtors' Motion [18].

The United States refers to a lack of full information and its prosecutorial discretion as reasons for the non-inclusion of at least thirteen other sites in its Proof of Claim:

> Because of the large number of sites listed on the National Priorities List, the list of the nation's most pressing hazardous sites, and because of EPA's priority of devoting resources to the cleanup of

hazardous waste at those sites, even after being afforded this extra time, the United States was not able to obtain *full* information as to the Debtors' existing or potential Superfund liabilities. Therefore, *because of a lack of information, or for other reasons within the prosecutorial discretion of the United States,* the United States determined to make a claim for the Debtors' involvement at only seven Superfund sites.

U.S. Response at 3 (emphasis added).

### IV. *Analysis*

The questions of law outlined in Section II, *supra,* will be considered seriatim.

1. Future Response and Damage Costs:

The legal issue presented to the Court is whether future response costs and future natural resource damage costs at the Listed Sites are "claims" within the meaning of the Code, and subject to discharge.

The United States maintains that future response and damage costs based on prepetition conduct do not give rise to a bankruptcy claim subject to discharge, and that only those costs already incurred prior to reorganization are dischargeable claims. In support of its position, the United States argues that under the Code, the time at which a claim arises is determined by reference to substantive non-bankruptcy law, and that CERCLA does not give rise to

covery action lies only after EPA has incurred response costs. *See id.*

**15.** As the preceding Section on Listed Sites, this section is similarly derived in large part from Debtors' pleadings, and the United States has not disputed the factual representations made by Debtors. However, since the issue regarding Debtors' liability at Unlisted Sites arises from Debtors' Motion for Summary Judgment, *see* Section IV–(2), *infra,* the factual representations adopted by the Court in this section are undisputed and binding.

**16.** The thirteen Unlisted Sites consist of: the Bay Drum Site (Tampa, Florida), Florence Land Recontouring Landfill (Florence Township, New Jersey), Wide Beach Development (Brant, New York), Sixty–Second Street Dump (Tampa, Florida), the Gold Coast Oil Site (Miami, Florida), Kin–Buc Landfill (Edison, New Jersey),

McKin Co. (Gray, Maine), Liquid Disposal Inc. (Utica, Michigan), SED Inc. (Greensboro, North Carolina), Cannons Engineering Corp. (Bridgewater, Massachusetts), Operating Industries, Inc. Landfill (Monterey Park, California), Taylor Road Landfill (Hillsborough County, Florida), and Sand Springs Petrochemical Complex (Sand Springs, Oklahoma).

**17.** Debtors' Appendix A, attached to Debtors' Motion, presents in tabular form information for each of the thirteen known Unlisted Sites concerning National Gypsum's alleged disposal, the alleged release or threat of release, and the alleged incurrence of response costs. Debtors have provided documentation supporting the information summarized in the table.

**18.** Appendix B, attached to Debtors' Motion, is a print-out of a CERCLIS search conducted for Debtors.

liability or to a cognizable legal claim until costs have been expended or remedial measures adopted to address environmental hazards.

In contrast, the Debtors maintain that future response and damage costs based on pre-petition conduct are pre-petition claims subject to discharge under the Code. The Debtors claim that although the existence of a claim under the Code is determined by reference to the substantive non-bankruptcy law, the timing of a claim is not; and that courts must look to the earliest possible date upon which a claim may arise, so as to maximize the scope of a discharge. Debtors propose that the following three triggering events determine the time at which a CERCLA claim arises under the Code: (1) pre-petition conduct by the Debtors at a site; (2) pre-petition release or a threatened release of hazardous substances occurs at a site; or (3) pre-petition incurrence of the first response costs at a site by the United States.

Congress enacted CERCLA in response to the vast threats to public health and safety presented by unsafe disposal of toxic chemicals and hazardous substances. *See Voluntary Purchasing Groups v. Reilly*, 889 F.2d 1380 (5th Cir.1989). The provisions of CERCLA serve two goals,

> First, Congress intended that the federal government be immediately given the tools necessary for a prompt and effective response to problems of a national magnitude and resulting from hazardous waste disposal. Second, Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created.

*United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100, 1112 (D.Minn. 1982). *See also Walls v. Waste Resource Corp.*, 823 F.2d 977, 980–81 (6th Cir.1987).

Once a potentially responsible party is in bankruptcy, the provisions of CERCLA cannot stand as the sole relevant statutory guide, and must be reconciled with the provisions of the Code. Contrary to the practical impact of the party's respective arguments, it is not a question of which statute should be accorded primacy over the other, but rather what interaction between the two statutes serves most faithfully the policy objectives embodied in the two separate enactments of Congress. In order to best serve the goals of CERCLA in the context of bankruptcy, the Court must recognize the circumstances particular to bankruptcy proceedings and the provisions of the Code that by necessity affect the PRP's ability to partake in environmental costs and remedies, as well as its ability to reorganize.

As previous courts have recognized, CERCLA and the Code are in tension in significant respects.

> The conflict begins at a basic level, since the goal of CERCLA—cleaning up toxic waste sites promptly and holding liable those responsible for the pollution—is at odds with the premise of bankruptcy, which is to allow debtors a fresh start by freeing them of liability. The two statutes also differ in their timing. To foster rapid cleanup, Congress embraced a policy of delaying litigation about cleanup costs until after the cleanup. Thus, under CERCLA, liability is not assessed until after the EPA has investigated a site, decided what remedial measures are necessary, and determined which potentially responsible persons will bear the costs.

*In re Combustion Equipment Associates, Inc.*, 838 F.2d 35, 37 (2d Cir.1988).

Under the provisions of CERCLA, EPA has the authority to investigate hazardous sites, select a remedy and either seek affirmative relief (through an administrative order or injunction) to force a cleanup, or perform a cleanup using money from the Superfund and subsequently recover costs associated with the cleanup. *See* 42 U.S.C. §§ 9604, 9606, 9607, 9611. In fact, PRP liability is not assessed until after the EPA has investigated a site and adopted remedial measures under Section 113(h) of CERCLA. *See id.* § 9613(h); *see also In re Combustion*, 838 F.2d at 37 (CERCLA precludes pre-enforcement judicial review so as to allow for cleanup before litigation.).

Under the provisions of the Code, on the other hand, all pre-petition claims are generally subject to discharge. *See* 11 U.S.C. § 727(b). Section 101(4) of the Code defines a claim, in relevant part, as a:

right to payment, whether or not such right is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

11 U.S.C. 101(4)(A).

Furthermore, the Code requires estimation of all contingent or unliquidated claims which "unduly delay the administration of the case.[19]" 11 U.S.C. 502(c)(1).

The legislative history of the Code reflects Congress' intent that the term "claim" be given broad interpretation so that "all legal obligations of the debtor, no matter how remote or contingent will be able to be dealt with in the bankruptcy case." H.R.Rep. No. 595, 95th Cong., 1st Sess. 309, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6266. The courts accordingly have given a broad and expansive reading to the term "claim". *See Ohio v. Kovacs*, 469 U.S. 274, 279, 105 S.Ct. 705, 707, 83 L.Ed.2d 649 (1985).

 Determination of whether a claim arises in bankruptcy requires an analysis of interests created by non-bankruptcy substantive law. *See In re Remington Rand Corp.*, 836 F.2d 825, 830 (3d Cir.1988); *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 941 (3d Cir.), *cert. denied* 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985). A claim exists only if before filing of the bankruptcy petition, the relationship between the debtor and the creditor con-

tained all the elements necessary to give rise to a legal obligation—"a right to payment"—under the relevant non-bankruptcy law. *See United States v. Union Scrap Iron & Metal*, 123 B.R. 831, 835 (D.Minn. 1990); *In re UNR Industries, Inc.*, 29 B.R. 741, 745–46 n. 4 (N.D.Ill.1983). Bankruptcy does not provide a forum for the creation of new rights, but "serves only as a forum for the recognition of rights already acquired." *In re Credit Industrial Corp.*, 366 F.2d 402, 407 (2d Cir.1966).

 However, the creditor need not have a cause of action that is ripe for suit outside of bankruptcy in order for it to have a pre-petition claim for purposes of the Code. *See In re Remington Rand Corp.*, 836 F.2d 825, 826–27 (3d Cir.1988)[20]. The Code encompasses within the term "claim" all "contingent" "unliquidated" and "unmatured" rights to payment. *See* 11 U.S.C. § 101(4). The Code's power to estimate contingent claims similarly extends to otherwise unripe causes of action. *See In re Combustion*, 838 F.2d at 40. While non-bankruptcy law governs the *existence* of a claim under the Code, it is not dispositive of the *time* at which a claim arises under the Code. It is immaterial for the purpose of bankruptcy, whether EPA's claims against the Debtors are ripe for adjudication under CERCLA, as long as all the elements that can give rise to liability under CERCLA have occurred pre-petition.

 In reading together the statutory frameworks of CERCLA and the Code, the landmark case of *In re Chateaugay Corp.*, 944 F.2d 997 (2d Cir.1991), used the bankruptcy concept of contingent claims to bring future CERCLA response and dam-

---

**19.** Estimation can serve several purposes. Estimation of unliquidated and contingent claims "is essential prior to the hearing on confirmation of a plan, in order for the court to evaluate the feasibility of the plan without delaying the confirmation process." *In re MacDonald*, 128 B.R. 161, 164 (W.D.Tex.1991). It also serves the fundamental Code policy of treating similarly situated creditors equally, *see Matter of Brints Cotton Marketing, Inc.*, 737 F.2d 1338, 1342 (5th Cir.1984), and ensuring that Debtors receive a "fresh start" "without the threat of lingering claims 'riding through' the bankruptcy," *In re Baldwin–United Corp.*, 55 B.R. 885, 898 (Bankr. S.D.Ohio 1985).

**20.** The United States relies on the Third Circuit case of *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936 (3d Cir.), *cert. denied,* 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985), for its argument that a bankruptcy claim does not exist until a suit is ripe under the substantive law. The Third Circuit itself later retreated from this position in *In re Remington, supra,* and other courts have widely criticized the *Schweitzer* reasoning, *see, e.g., In re Jensen,* 127 B.R. 27, 30–31 (9th Cir. BAP 1991); *In re Edge,* 60 B.R. 690, 704 (Bankr.M.D.Tenn.1986).

age costs within the ambit of present discharge proceedings under the Code.

The relationship between environmental regulating agencies and those subject to regulation provides sufficient "contemplation" of contingencies to bring *most* ultimately maturing payment obligations based on pre-petition conduct within the definition of "claims".

*Id.* at 1005 (emphasis added). Based on this regulatory relationship, the court in *Chateaugay* found that,

nothing prevents the speedy and rough estimation of CERCLA claims for purposes of determining EPA's voice in the Chapter 11 proceedings, with ultimate liquidation of the claims to await the outcome of normal CERCLA enforcement proceedings in which EPA will be entitled to collect its allowable share (full or pro rata, depending on the reorganization plan) of incurred response costs.

*Id.* at 1006.

A "speedy and rough estimation" of the claims for the purposes of bankruptcy is not meant to interfere with the "normal CERCLA enforcement proceedings," and in fact, "final liquidation of the claims" must await such proceedings. *Id.* Estimation serves solely to determine the status to be accorded potential CERCLA claims in bankruptcy in order to facilitate "administration of the case," 11 U.S.C. 502(c)(1); and does not entail the type of litigation precluded by 42 U.S.C. § 9613(h) [21]. Accordingly, the court in *Chateaugay* found CERCLA's prohibition of pre-enforcement review inapplicable. *See Chateaugay*, 944 F.2d at 1006.

The court in *Chateaugay* focused on conduct resulting in release or threatened release of hazardous substances as the relevant point in time for determining whether a claim has arisen for the purposes of bankruptcy. An obligation to pay the EPA for response costs is a dischargeable claim whenever based upon a pre-petition conduct resulting in release or threatened release of hazardous substances. *See id.* at 1005.

In so finding, the court in *Chateaugay* refused to recognize as claims, response costs based simply on debtor's pre-petition conduct, as opposed to conduct resulting in release or threatened release of hazardous substances pre-petition. *See id.* at 1000, 1005. As a result of this distinction, the court found that the placing of hazardous substances in sealed containers pre-petition, followed by release of the substances into the environment years after confirmation, is not a claim. *See id.*

In determining what treatment to accord future CERCLA costs, the court in *Chateaugay* drew on the treatment of contract cases in bankruptcy, while recognizing that,

Though there does not yet exist between EPA and [debtor] the degree of relationship between claimant and debtor typical of an existing though unmatured contract claim, the relationship is far closer than that existing between future tort claimants totally unaware of injury and a tort-feasor. EPA is acutely aware of LTV and vice versa.

*Id.* at 1005. The court finally noted that, [i]n the context of contract claims, the Code's inclusion of "unmatured" and "contingent" claims is usually said to refer to obligations that will become due upon the happening of a future event that was *"within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created."*

*Id.* at 1004 (citing *In re All Media Properties Inc.*, 5 B.R. 126, 133 (Bankr.S.D.Tex. 1980), *aff'd mem.*, 646 F.2d 193 (5th Cir. 1981)) (emphasis added).

In the final analysis, however, the court in *Chateaugay* appears to part from the

---

**21.** Estimation, as the United States claims, "would necessarily embroil the parties and the bankruptcy court in disputes over the wisdom and scope of possible remedies before EPA had fully investigated the concerned sites." U.S. Motion at 39. However, the presentation of evidence and testimony for purposes of reaching an estimate is not tantamount to the litigation precluded by 42 U.S.C. § 9613(h). Section 113(h) was intended to prevent the delay in cleanup activity that would result from a preliminary determination of liability through litigation. *See In re Combustion*, 838 F.2d at 37.

contractual standard it earlier had aligned itself with by adopting so broad a definition of claim so as to encompass costs that could not "fairly[22]" have been contemplated by the EPA or the debtor pre-petition.

> True, EPA does not yet know the full extent of the hazardous waste removal costs that it may one day incur and seek to impose upon LTV, and *it does not yet even know the location of all the sites at which such wastes may yet be found.* But the location of these sites, the determination of their coverage by CERCLA, and the incurring of response costs by EPA are all steps *that may fairly be viewed,* in the regulatory context, as rendering EPA's claim "contingent," rather than as placing it outside the Code's definition of "claim."

*Id.* at 1005 (emphasis added).

The *Chateaugay* ruling covers releases that have occurred pre-petition, even though they have not been discovered by EPA or anyone else. *See id.* at 1000. The powers and knowledge of a regulatory agency are presumed to "fairly" allow for "sufficient contemplation of [such] contingencies." *Id.* at 1005.

While similarly of the view that conduct giving rise to release or threatened release of hazardous substances pre-petition should be the relevant inquiry in determining the existence of a claim in bankruptcy[23], this Court is not willing to favor the Code's objective of a "fresh start" over CERCLA's objective of environmental cleanup to the extent exhibited by *Chateaugay*[24]. Despite the distinction drawn in *Chateaugay, see supra* page 406, under the terms of CERCLA, there exists no meaningful distinction between debtor's conduct and the release or threatened release resulting from this conduct[25]. The only meaningful distinction that can be made regarding CERCLA claims in bankruptcy is one that distinguishes between costs associated with pre-petition conduct resulting in a release or threat of release that could have been "fairly"[26] contem-

**22.** The court in *Chateaugay* uses the term "fairly" on numerous occasions, *see, e.g., Chateaugay,* 944 F.2d at 1005, and specifically in affirmation of the lower court's recognition that "before a contingent claim can be discharged, it must result from pre-petition conduct *fairly* giving rise to that contingent claim." *In re Chateaugay Corp.,* 112 B.R. 513, 521 (S.D.N.Y.1990) (emphasis added). This Court, finding the use of the term "fairly" both significant and apt, adopts the same language.

**23.** As the United States points out, under CERCLA itself, the release or threat of release serves as a predicate for EPA to exercise its response authority. *See* 42 U.S.C. §§ 9604, 9606.

**24.** Both the United States and the Debtors read *Chateaugay* so as to discharge all costs relating to pre-petition conduct resulting in a release or threat of release, *regardless* of whether these costs are fairly within the contemplation of the parties pre-petition.

Upon careful reading of *Chateaugay,* this Court is unable to determine whether the parties' proposed reading is accurate due to conflicting indications in the opinion itself. The use of the word "fairly" in *Chateaugay* has already been alluded to. *See supra* note 22. Also, due to a regulatory agencies' ability to contemplate future claims, the court in *Chateaugay* found that "most"—but not all—ultimately maturing payment obligations fall within the defi-

nition of claims. *See supra* page 17 (quoting *Chateaugay,* 944 F.2d at 1005).

Furthermore, it is not clear to the Court why the placing of hazardous substances in sealed containers pre-petition, followed by release of the substances into the environment years after confirmation, is not a claim; while the release of substances at locations unknown to the parties pre-petition is a claim. It appears that *Chateaugay* was motivated by notions of fairness in excluding the disposal of containers from the definition of claim. *See* 944 F.2d at 1005. However, under CERCLA, "release" includes the dumping or disposing of containers of hazardous substances. *See* 42 U.S.C. § 9601(22). In both situations, similar concerns with fairness arise in that a "release" has occurred pre-petition, while the hazardous results of such release are not known or manifest until some time after confirmation.

**25.** As regards CERCLA litigation, the Fifth Circuit has taken the position that disposal of hazardous substance itself constitutes a "release or threat of release." *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 669 (5th Cir.1989). Section 9601(22) of Title 42 defines "release" as including "dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)."

**26.** The concept of "fairly" is commensurate with the Code's requirement of adequate notice. *See*

plated by the parties; and those that could not have been "fairly" contemplated by the parties[27].

■ A number of factors are relevant to whether fair contemplation of future costs based on pre-petition conduct can occur at any particular site by the parties. Such factors include knowledge by the parties of a site in which a PRP may be liable, NPL listing, notification by EPA of PRP liability, commencement of investigation and cleanup activities, and incurrence of response costs[28]. *See supra* notes 11–14. It appears that at least one, and at times all, of these factors have occurred in the seven sites listed by the EPA for future response and natural resource damage costs, permitting "a speedy and rough estimation of CERCLA claims for purposes of determining EPA's voice in the Chapter 11 proceedings with ultimate liquidation of the claims to await the outcome of normal CERCLA enforcement proceedings[29]." *Chateaugay,* 944 F.2d at 1006.

The "fair contemplation" standard, however, is not meant to encourage or permit dilatory tactics on the part of EPA or any other relevant government agency. In criticizing the *Chateaugay* court's emphasis

on EPA's "opportunity" to file their environmental claims before confirmation, the EPA argues that this focus belies an inadequacy in the decision in that,

> if a government agency is diligent and files a proof of claim for possible future response costs, it faces the possibility that its claim will be discharged. But if a similarly situated agency does not file a claims [sic], waiting instead to pursue the recovery of costs only after they have been incurred in the ordinary course of its activities, its claims will be preserved.

U.S. Motion at 36.

The existence of a claim in bankruptcy "should not depend on the victim's appraisal of the likely success of post-bankruptcy collection efforts." *In re Edge,* 60 B.R. at 700 n. 8.

There exists no statute of limitations under the terms of CERCLA itself by which EPA must respond to a release or else lose its right to seek relief against PRPs. The only statute of limitations relating to response actions runs from the date the removal action is completed or from the date on-site construction is initiated. *See* 42

---

11 U.S.C. §§ 521, 523; and Rule 2002 of the Rules and Forms of Practice and Procedure in Bankruptcy.

**27.** The court in *U.S. v. Union Scrap Iron & Metal,* 123 B.R. 831, 834–37 (D.Minn.1990) similarly was sensitive to what was within the fair contemplation of the parties prior to bankruptcy. The court in *Union Scrap* refused to discharge environmental claims arising post-bankruptcy based on pre-petition conduct since at the time of the bankruptcy, the EPA was not aware that the debtor was a PRP at a site not owned by debtor; and the debtor did not acknowledge any relation to the site under investigation in its bankruptcy disclosure statement or plan of reorganization.

It is certain, in any event, that there may exist considerable delay between environmental harm and discovery of such harm. *See, e.g., United States v. Northeastern Pharmaceutical & Chemical Co.,* 579 F.Supp. 823 (W.D.Mo.1984), *aff'd in part and rev'd in part,* 810 F.2d 726 (8th Cir.1986) (chemicals dumped in 1971; site discovered eight years later through anonymous tip); *see also* W. Glaberson, *Love Canal: Suit Centers on Records from 1940's,* N.Y. Times, B1 (Oct. 22, 1990) (chemicals dumped from at least 1940's; site becomes manifest in 1970's).

**28.** Estimation of CERCLA claims is clearly possible in bankruptcy proceedings. In CERCLA litigation, the government has consistently sought estimation of future response costs based on the response costs already incurred, and the courts have uniformly granted the government's request. *See, e.g., United States v. Hardage,* 733 F.Supp. 1424, 1439 (W.D.Okl.1989); *United States v. A & F Materials Co. Inc.,* 578 F.Supp. 1249, 1259 (S.D.Ill.1984); *United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 211–12 (W.D.Mo.1985). It is precisely this type of estimation of CERCLA claims that would occur in the context of bankruptcy.

**29.** In allowing for such rough and speedy estimation of CERCLA claims, the Court is mindful of the fact that each hazardous waste site is unique, and that assessment of damages and design of cleanup remedies are time consuming if they are meant to be effective in the long run. *See* 42 U.S.C. §§ 9604, 9606, 9607, 9613(h). However, estimation is not meant to necessarily hasten this process, but to secure the possibility of payment by PRPs in bankruptcy for the costs of environmental damage they might have caused based on what can fairly be contemplated by the parties due to pre-petition conduct.

U.S.C. § 9613(g)(2)(A)–(B). However, Congress has set performance goals for EPA to meet in studying a certain number of hazardous sites each year. *See* 42 U.S.C. § 9616. Congress has further required that the relevant government agency move diligently with remedial investigation and feasibility studies for the purpose of assessing and responding to natural resource damages. *See* 42 U.S.C. 9613(g)(1)(B)(ii).

■ The time scheme governing EPA under CERCLA by necessity is altered when it comes in contact with the Code. In order for the EPA to preserve its claims in regard to a PRP in bankruptcy, its duties are triggered by the mere discovery of a site linked to the Debtors, and extends to such activity that would allow a rough and speedy estimation of CERCLA claims under the Code. Contrary to the United States' Position, it need not have *"full* information as to Debtors' existing or potential Superfund liabilities," *see supra* page 403, in order to include unliquidated contingent claims in its Proof of Claim subject to estimation.

In sum, all future response and natural resource damages cost based on pre-petition conduct that can be fairly contemplated by the parties at the time of Debtors' bankruptcy are claims under the Code.

## 2. Costs at Unlisted Sites:

The legal issue presented to the Court is whether Debtors' environmental liabilities for the Unlisted Sites arising from prepetition conduct are "claims" within the meaning of the Bankruptcy Code, subject to discharge.

The Debtors argue that because all liability at the Unlisted Sites arise from prepetition conduct they are claims; and since the bar date is past, any claim by the government with respect to Unlisted Sites is barred. The United States argues that claims in relation to Unlisted Sites are not claims subject to discharge because the Debtors have made no showing that a declaration of dischargeability is necessary for confirmation of a plan of reorganization.

In contrast to the other legal issues presented for Court determination, this issue arises from Debtors' Motion for Summary Judgment on their claim for a Declaratory Judgment under 28 U.S.C. § 2201, set forth in their Amended Counterclaim [30]. As a preliminary matter, the United States contests the jurisdiction of this Court to entertain this issue, and moves for dismissal of the Third Claim for relief of Debtors Amended Counterclaim. The United States argues that the Court lacks jurisdiction to entertain Debtors' claim for declaratory judgment on two grounds: (1) the United States has not waived its sovereign immunity as regards the declaration of non-liability prior to any claim being asserted by the United States; and (2) Section 113(h) of CERCLA is a jurisdictional bar to such declaration. The Debtors maintain that jurisdiction exists because the United States has waived its sovereign immunity, and the jurisdictional bar of Section 113(h) is inapplicable.

The United States' arguments are without merit, and this Court has jurisdiction to address the Third Claim in Debtor's Counterclaim.

■ First, although specific statutory waiver of sovereign immunity is necessary in order to maintain a lawsuit against the United States, *see Army & Air Force Exch. Serv. v. Sheehan,* 456 U.S. 728, 734, 102 S.Ct. 2118, 2122, 72 L.Ed.2d 520 (1982), Section 106(c) of the Code [31] contains pre-

---

**30.** On October 25, 1991 the Debtors amended their Counterclaim with the consent of the United States "in order to provide the Court with an additional procedural vehicle through which this issue could be addressed." Debtors' Reply at 5. The Debtors argue that a declaratory judgment is necessary to insure that they achieve a viable reorganization.

**31.** Section 106(c) of the Code reads in pertinent part:

Except as provided in subsections (a) and (b) of this section and notwithstanding any assertion of sovereign immunity,
(1) a provision of this title that contains "creditor", "entity" or "governmental unit" applies to governmental units; and
(2) a determination by the court of an issue arising under such a provision binds governmental units.

Congress included Section 106(c) so as to "comply with the requirement in case law that an

cisely such waiver for issues arising under bankruptcy involving the United States. In fact, Section 106(c) "waives the sovereign immunity of the Federal Government so that the Federal Government is bound by determinations of issues by the bankruptcy court even when it did not appear and subject itself to the jurisdiction of the court." *Hoffman v. Connecticut Department of Income Maintenance*, 492 U.S. 96, 103, 109 S.Ct. 2818, 2823, 106 L.Ed.2d 76 (1989). In this case, the United States has clearly appeared before the bankruptcy court.

The Seventh Circuit facing a similar issue found that a debtor may seek a declaration from the bankruptcy court that a debt owed to an agency of the United States is dischargeable:

> [S]ection 106(c) of the Bankruptcy Code waives the sovereign immunity of the United States with respect to questions relating to dischargeability of debts owed to the government.

*In re Neavear*, 674 F.2d 1201, 1204 (7th Cir.1982).

■ Second, Section 113(h) [32] of CERCLA does not serve as a jurisdictional bar to declaratory relief in the context of bankruptcy when the United States has engaged in enforcement action by filing a Proof of Claim. In the combined context of CERCLA and the Code, only two cases have addressed the applicability of Section 113(c) to declaratory judgments. The first case left the issue explicitly open, *see In re Combustion Equipment Associates, Inc.*, 838 F.2d 35 (2d Cir.1988); and the second found Section 113(c) inapplicable, *see Chateaugay, supra.*

In *In re Combustion*, the debtor after emerging from reorganization, sought a declaratory judgment that unincurred response costs based on pre-petition releases were claims that had been discharged. The Court in *In re Combustion* found that dispute unripe since the EPA had not yet decided whether to act, if at all, against the plaintiff for environmental damage; and explicitly left open the question whether a declaratory judgment for CERCLA claims would be appropriate *during* a reorganization proceeding. *See* 838 F.2d at 40–41.

In *Chateaugay*, the government argued that Section 113(h)'s ban on pre-enforcement judicial review required that it receive a declaratory judgment upholding its contention that unincurred response costs are not dischargeable claims. In rejecting the government's argument, the court found that in a context where CERCLA claims are being estimated for the purpose of bankruptcy, whilst ultimate liquidation of claims awaits the outcome of normal CERCLA enforcement proceedings,

> prohibition of pre-enforcement review is simply inapplicable. The Court is not being called upon to "review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title."

*Chateaugay*, 944 F.2d at 1006.

However, the circumstances before this Court are clearly distinguishable from *Chateaugay*. A declaratory judgment relating to claims in sites not listed in the Proof of Claim is different from a declaratory judgment relating to unincurred response costs at listed sites that are subject to estimation in bankruptcy and liquidation in normal CERCLA proceedings. In the circumstances before us, a declaratory judgment for all practical purposes clearly interferes with "normal CERCLA enforcement proceedings" in that it precludes future asser-

express waiver of sovereign immunity is required to be effective." 124 Cong.Rec.H. 11,091 (Sept. 28, 1978).

**32.** Section 113(h) of CERCLA provides in relevant part,

> *No Federal court shall have jurisdiction* under Federal law other than under section 1332 ... or under state law which is applicable or relevant and appropriate under section 9621

of this title.... *to review any challenges to removal or remedial action* selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title, in any action except one of the following....
42 U.S.C. § 9613(h) (emphasis added).
For a discussion of the exceptions to Section 113(h)'s jurisdictional bar, see *infra* note 35 and accompanying text.

tion of liability by the United States against the Debtors for the Unlisted Sites.

Contrary to the assertion of the Debtors [33], Section 113(h) is applicable in these circumstances. The Fifth Circuit has found that a challenge to liability is tantamount to a challenge to response action under Section 113(h). In *Voluntary Purchasing Groups v. Reilly*, 889 F.2d 1380, 1389–90 (5th Cir.1989), the court found that Section 113(h) barred judicial review of a PRP's complaint seeking declaratory relief that it was not a liable party before the United States had brought a cost-recovery suit.

> If PRPs were allowed to file suits for declaratory judgment prior to cost recovery suits being filed by the EPA, much of the EPA's time and resources could end up being allocated to litigation in this area.

. . . . .

Moreover, the crazy quilt litigation that could result from allowing PRPs to file suits for declaratory judgments of non-

liability could force the EPA to confront inconsistent results.

*Id.* at 1390 (citations omitted).

■■■ However, once the United States files a Proof of Claim, the exceptions to the jurisdictional bar of Section 113(h) are activated [34]. The exceptions to the jurisdictional bar of Section 113(h) are various enforcement or cost-recovery measures that can be taken by the United States [35]. In reading the Code and CERCLA together, the filing of a Proof of Claim constitutes such governmental action, and falls under the enumerated exceptions to Section 113(h). Any other reading would allow the United States, by not filing a Proof of Claim, to preserve its claims for all sites for post-bankruptcy proceedings to the detriment of all other creditors whose claims are discharged, and of the Debtors to the extent post-bankruptcy environmental claims impacts their ability to effectively reorganize. In short, any other reading would allow the United States to completely circumvent the objectives underlying the Code [36].

Having ascertained this Court's jurisdiction, the determination of whether Debtors'

---

**33.** In regard to the applicability of Section 113(h), the Debtors state,

> This is not, as mischaracterized by the Government, a suit "for a declaration of non-liability under CERCLA." Rather, this is a suit for a declaration that whether or not Debtors have any liability under CERCLA for the Unlisted Sites, the assertion of any such liability is barred and the liability is discharged upon confirmation. This is a question of interpretation involving the Code, not CERCLA.

Debtors' Reply at 9.

Debtors' argument is implausible in that it draws artificial distinctions at the cost of real practical effects, and assumes that the Code should be accorded primacy in a case involving interpretation of both the Code and CERCLA. As stated earlier, arguments based on the primacy of one statute over the other can not be adopted by this Court.

**34.** The Court is cognizant of the fact that the combined effect of its ruling is that in order to preserve its CERCLA claims against a bankrupt PRP, the United States must file a Proof of Claim; and that in filing such Proof of Claim, the United States subjects itself to declaratory relief, otherwise precluded by Section 113(h), for unlisted sites. However, this is the only reading of CERCLA and the Code that strikes a

balance between the objectives served by both statutes.

**35.** The exceptions to Section 113(h)'s jurisdictional bar consist of actions to recover response costs or damages or for contribution, to enforce an order or recover a penalty for violation of such order, for reimbursement, and to compel a remedial action. *See* 42 U.S.C. § 9613(h)(1)–(5).

**36.** In addition, the cases relied on by the United States to demonstrate that Section 113(h) is a jurisdictional bar are distinguishable. The United States relies largely on *Voluntary Purchasing, supra,* to demonstrate that Section 113(h) bars declaratory relief in this case. However, in *Voluntary Purchasing,* the Fifth Circuit was faced with a situation where the United States had taken *no* action to secure its claims. The Fifth Circuit was not faced with the unique circumstances surrounding the interaction of the Code and CERCLA, and the filing by the United States of a Proof of Claim for the purpose of securing eventual enforcement of its environmental claims against a PRP in bankruptcy. In fact, the court's decision in *Voluntary Purchasing,* barring declaratory relief, was specifically limited to cases where the United States had not brought a cost recovery suit. 889 F.2d at 1389–90.

environmental liabilities at Unlisted Sites arising from pre-petition conduct are claims follows directly from the analysis in the preceding Section as to when a claim arises. All liability at the Unlisted Sites arising from pre-petition conduct resulting in release or threatened release, fairly within contemplation of the parties, are dischargeable claims [37].

At the thirteen Unlisted Sites, the United States had enough knowledge to fairly base contingent liability on, but chose not to do so. *See supra* page 403. The United States does not challenge the Debtors' presentation that at all of the Unlisted Sites the alleged conduct occurred pre-petition, a release or threat of release existed pre-petition, and the first response costs were incurred pre-petition [38]. *See* Debtors' Motion at 6.

■ Pursuant to Bankruptcy Rule 3003(c)(2), any claim not asserted in the Proof of Claim is barred. However, the United States reserves its right to seek permission to amend its previously submitted Proof of Claim in relation to the Unlisted Sites. The Debtors object to such amendment on the grounds that the United States knowingly did not include the thirteen other sites in the Proof of Claim, and there exists no ground for excusable neglect. The Debtors further argue that amending the Proof of Claim so as to include the Unlisted Sites at this point in the bankruptcy proceedings would severely prejudice the Debtors.

■ Under Bankruptcy Rule 9006(b), the Court has discretion to extend the time to file a Proof of Claim after the bar date where the failure to timely file was the result of "excusable neglect." In past consideration of this Rule, this Court has de-

fined excusable neglect as "the failure to timely perform a duty ... due to circumstances which were beyond the reasonable control of the person whose duty it was to perform." *Mackie v. Production Oil Co.*, 100 B.R. 826, 827 & n. 3 (N.D.Tex.1988) (citations omitted). Although excusable neglect is a flexible concept, "[c]ourts require 'unique' and/or 'extraordinary' circumstances' to excuse a creditor's failure to file by the bar date." *Id.* at 827 (citations omitted).

■ The novel nature of the legal issues presently before the Court constitute the "unique" or "extraordinary" circumstances" required to excuse a creditor's failure to file by the bar date. *See id.* Extension of the bar date as relates to the United States claims for Unlisted Sites is warranted under these circumstances.

3. Administrative Expense Priority:

■ The legal issue presented is whether response costs incurred in connection with property presently owned by Debtors are entitled to administrative expense priority [39].

The United States' Proof of Claim seeks reimbursement of expenses incurred at the Salford Quarry Site—aimed at preserving the property—since the filing of the bankruptcy petitions. The United States argues that since this Site is presently owned by the Debtors, such expenses should be treated as priority administrative expenses under the Code.

The Debtors, on the other hand, maintain that the entirety of the United States' claim at the Salford Quarry Site is a general unsecured claim. The Debtors argue that the standard for administrative priority un-

---

**37.** The United States argues that claims for the Unlisted Sites are not discharged because Debtors have made no showing that a declaration of dischargeability is necessary. The necessity of the dischargeability is not determinative of when a CERCLA claim arises for bankruptcy purposes. Furthermore, this Court has previously held that the CERCLA claims are potentially so large as to interfere with Debtors' reorganization if not estimated. *See* November 12, 1991 Memorandum Opinion & Order at 5.

**38.** The party opposing a motion for summary judgment must point out specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Castillo v. Bowles,* 687 F.Supp. 277, 280 (N.D.Tex.1988). In the absence of such showing, the facts will be deemed undisputed.

**39.** Of all seven Sites, only the Salford Quarry Site is presently owned by the Debtors.

der the Code is not met since the United States has made no showing that the expenses incurred benefit the estate in any way or are necessary to prevent an imminent, identifiable harm. Adopting the position of the United States, the Debtors argue, would give the United States the impermissible power to shift parts of its pre-petition claim from general unsecured to administrative status.

Pursuant to Section 507 of the Code, administrative expenses allowed under Section 503(b) of the Code are entitled to priority. *See* 11 U.S.C. § 507. Section 503(b) includes, in relevant part, "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after commencement of the case." *Id.* at § 503(b)(1)(A). Whether a particular expense is an "actual and necessary cost" is a question of fact to be determined "after notice and a hearing." *Id.* at § 503(b).

In the context of environmental claims, the meaning of "preserving the estate" under Section 503 of the Code has been expanded to encompass protection of the environment and public health. The Supreme Court in *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), enunciated the obligations of a bankruptcy trustee or a debtor-in-possession in ensuring that the environment and public health are not unduly degraded:

> [A]nyone in possession of the site ... must comply with the environmental laws.... Plainly, that person or firm may not maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such conditions.

*Id.* at 502, 106 S.Ct. at 760 (quoting *Ohio v. Kovacs*, 469 U.S. 274, 285, 105 S.Ct. 705, 711, 83 L.Ed.2d 649 (1985)). The Supreme Court in *Midlantic* further restricted the ability of a trustee or debtor to abandon property where such abandonment would result in "imminent and identifiable harm"

to the public health or safety. *Id.* 474 U.S. at 507 n. 9, 106 S.Ct. at 762 n. 9.

In accord with the Supreme Court's recognition of a bankruptcy trustee or debtor's obligations in *Midlantic*, lower courts have allowed the payment of response costs incurred post-petition based on conduct occurring pre-petition, as administrative priority expenses where the costs were necessary to remedy conditions that pose an "imminent and identifiable" threat to the public health or safety. *See Chateaugay*, 944 F.2d at 1009–10; *In re Wall Tube & Metal Products Co.*, 831 F.2d 118, 123–24 (6th Cir.1987); *In re Peerless Plating Co.*, 70 B.R. 943, 946–48 (Bankr.W.D.Mich. 1987); *In re Stevens*, 68 B.R. 774, 783 (Bankr.D.Me.1987); *In re T.P. Long Chemical Inc.*, 45 B.R. 278, 286 (Bankr.N.D.Ohio 1985).

Finally, the Debtors' concern with the possibility that the United States would delay its response costs so as to benefit from administrative status is misplaced. First, a relatively small portion of the United States' Proof of Claim falls under administrative status, because of all the sites at issue only the Salford Quarry is presently owned by the Debtors. Second, before any costs incurred by the United States are accorded administrative status, the notice and hearing requirements of Section 503(b) of Title 11 must be satisfied. Third, the United States is not hereby attempting to fix its entire claim at the Salford Quarry, but rather is acting during administration of the estate to remedy ongoing effects of a release of hazardous substances [40].

In sum, all response costs incurred post-petition as a result of conduct occurring pre-petition in regard to the Salford Quarry are entitled to administrative priority subject to the following specific determination: such costs were necessitated by conditions that posed an imminent and identifiable harm to the environment and public health.

### 4. Joint and Several Liability:

The legal issue presented is whether Debtors are jointly and severally liable for claims at the Listed sites.

---

**40.** Based on these same grounds, the *Chateaugay* court rejected the debtors' similar concern with abuse of the bankruptcy process by the government. *See* 944 F.2d at 1010.

The United States maintains that the Debtors' liability is joint and several under CERCLA for all costs incurred at all of the Listed Sites because the environmental injury is indivisible. The United States argues that equitable apportionment of costs is only appropriate in an adversarial action brought by the Debtors themselves for contribution under CERCLA against other responsible parties.

The Debtors, on the other hand, maintain that the United States' claim should be fixed at an amount reflecting Debtors' equitable share of liability. To provide for joint and several liability, the Debtors argue, would undermine the equitable nature of bankruptcy proceedings to the detriment of other creditors and the Debtors. Furthermore, the Debtors argue that CERCLA itself does not compel joint and several liability where inequitable.

CERCLA does not expressly provide for joint and several liability. Congress expressly left to the courts the determination of what standard of liability to impose under CERCLA, based on a case by case basis [41]. Subsequently, however, in enacting the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Congress endorsed the standard of joint and several liability imposed by the seminal case of *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802 (S.D.Ohio 1983). *See United States v. Monsanto Co.*, 858 F.2d 160, 171 n. 23 (4th Cir.1988) (Citing H.R.Rep. No. 253(I), 99th Cong.2d Sess., 79–80, *reprinted in* 1986 U.S.Code Cong. & Admin.News at 2835, 2861–62).

In determining the scope of liability, the *Chem–Dyne* Court followed the strict approach advocated by the Restatement (Second) of Torts. Under this approach, the burden of proof as to apportionment of harm is on the defendant; absent a showing of divisibility, each defendant is jointly and severally liable for the entire harm. *See Chem–Dyne*, 572 F.Supp. at 808.

Since *Chem–Dyne*, courts uniformly have imposed joint and several liability where the harm has been indivisible. *See, e.g., Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 672 (5th Cir.1989); *O'Neil v. Picillo*, 883 F.2d 176, 178–79 (1st Cir.1989); *United States v. Monsanto Co.*, 858 F.2d 160, 171–72 (4th Cir.1988). Even courts critical of the inequitable results of joint and several liability have applied this standard to the circumstances before them. *See, e.g., O'Neil* 883 F.2d at 178; *United States v. A & F Materials Co.*, 578 F.Supp. 1249, 1256 (S.D.Ill.1984).

In order to avoid joint and several liability, the Debtors must establish that (1) the environmental injury is in fact capable of divisibility; and (2) a reasonable basis exists for such apportionment. *See Chem–Dyne*, 572 F.Supp. at 811; *United States v. Miami Drum Services, Inc.*, 25 E.R.C. 1469, 1474, 1986 WL 15327 (S.D.Fla. 1986). Divisibility of harm is a question of fact to be determined by presentation of evidence. *See Kelley v. Thomas Solvent Co.*, 714 F.Supp. 1439, 1448 (W.D.Mich. 1989).

As discussed earlier, determination of whether a claim arises in bankruptcy requires an analysis of interests created by non-bankruptcy substantive law. *See supra* page 405. CERCLA as developed by case law provides for a joint and several standard of liability where the harm is indivisible. In enacting SARA, Congress had occasion to examine this case law but instead endorsed this development, and added two provisions to mitigate the possible inequities of joint and several liability. *See O'Neil*, 883 F.2d at 179.

First, the [SARA] Amendments direct the EPA to offer early settlements to defendants who the Agency believes are responsible for only a small portion of the harm, so called *de minimis* settlements. *See* [CERCLA] § 122(g). Second, the Amendments provide for a statutory cause of action in contribution, co-

---

**41.** *See* H.Rep. No. 253(I), 99th Cong.2d Sess. 74, *reprinted* in 1986 U.S.Code Cong. & Admin.News 2835, 2856 ("the explicit mention of joint and several liability was deleted from CERCLA in 1980 to allow courts to establish the scope of liability through a case-by-case application of traditional and evolving principles of common law and pre-existing statutory law.")

difying what most courts had concluded was implicit in the 1980 Act. *See* [CERCLA] § 113(f)(1). Under this section, courts "may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."

*Id.*

In sum, subject to a finding of divisibility, Debtors' liability at the Listed Sites will be estimated on the basis of joint and several liability.

### V. *Renewed Reference to Bankruptcy Court*

 On September 13, 1991 the Court withdrew reference from bankruptcy court of all matters pertaining to the United States' Proof of Claim, and all Debtors' responses to such claim. The Court found that disposition of these matters implicated substantial and material consideration of non-bankruptcy federal statutes, and warranted mandatory withdrawal of reference pursuant to 28 U.S.C. § 157(d).

The legal issues addressed in this Order dispose of the material matters at the heart of the intersection between the Code and CERCLA which had prompted the withdrawal of reference. At this time, the Court is of the opinion that this case should be referred to bankruptcy court pursuant to 28 U.S.C. § 157(a). Bankruptcy courts provide the expertise and efficiency intended by Congress in adjudication of core bankruptcy matters. *See In re White Motor Corp.*, 42 B.R. 693, 705 (N.D.Ohio 1984). Withdrawal of reference is no longer warranted where it is a question of "straight forward application of a federal statute to a particular set of facts." *In re Johns–Manville Corp.*, 63 B.R. 600, 602 (S.D.N.Y.1986).

### VI. *Conclusion*

The Court has made the following determinations:

1. All future response and natural resource damages costs based on pre-petition conduct, fairly within contemplation of the parties at the time of Debtors' bankruptcy, are claims under the Bankruptcy Code;

2. All liability at any site not listed in the amended United States' Proof of Claim based on pre-petition conduct, fairly within contemplation of the parties at the time of Debtors' bankruptcy, constitutes a claim under the Code;

3. All response costs incurred post-petition at a site presently owned by Debtors as a result of pre-petition conduct are administrative priority expenses where the costs were necessary to remedy conditions posing an imminent and identifiable threat to the public health or safety; and

4. Subject to a finding of divisibility, Debtors' liability at the Listed Sites will be estimated on the basis of joint and several liability.

Having determined the foregoing legal issues, the Court REFERS this case to bankruptcy court for further proceedings in the light of this opinion.

SO ORDERED.