TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-06-00393-CV






Strata Resources, a Texas Partnership; Steven Bland Epps; and 

Charles W. Brandes, Individually, Appellants


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT

NO. D-1-GV-01-003566, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING





O P I N I O N


 Strata Resources and its one-time general partners, Stephen Bland Epps and
Charles W. Brandes, appeal a judgment imposing administrative and civil penalties and requiring
reimbursement for funds expended to plug certain wells formerly operated by Strata. They bring five
issues contending that the well-plugging expenses imposed on Epps were pre-petition debts
discharged in Epps's bankruptcy, that they are not liable for plugging expenses on two of the wells
because the Railroad Commission acted improperly in converting these wells into water wells for
the landowner's benefit, that the Commission failed to properly offset well-plugging expenses with
the well equipment's salvage value, that the civil penalties imposed are not supported by the
evidence, and that the attorney's fees award is not supported by the evidence. We will affirm the
judgment in part, reverse and render in part, and reverse and remand in part.


BACKGROUND

 The State's claims for well-plugging reimbursement and penalties were tried to the
bench, and the following summarizes the pertinent evidence presented. Epps and Brandes were
Strata's sole partners. Strata was the operator on four sets of oil wells at issue in these proceedings: 
(1) the Salinas Lease, Well Nos. 1, 2, and 4; (2) the Oliveira Lease, Well Nos. 1, 2A, 3, and 4; (3) the
Q.K. Barber Lease, Well No. 1; and (4) four wells on the Guzman or Ramirez leases. On November
24, 1997, after Strata had become the operator on the Salinas and Oliveira wells, Brandes withdrew
from the partnership. However, no new form P-4 was filed after Brandes withdrew from the
partnership. (1) See 16 Tex. Admin. Code § 3.58(a) (2007). (2) The district court concluded that Brandes
had remained personally liable for maintaining the Salinas and Oliveira wells and for those leases,
and appellants do not challenge those holdings. 

 The Commission issued an administrative order with respect to each of the four sets
of wells. The first of the four orders (docket number XX-XXXXXXX) was issued September 12, 2000,
and required Strata and Epps, individually, to plug the Q.K. Barber Lease, Well No. 1, and assessed
Strata and Epps, individually, an administrative penalty of $4,000. The remaining three orders were
issued November 9, 2000. One of the November 9 orders (docket number XX-XXXXXXX) involved
the Guzman Lease, Well No. 12; the Ramirez Lease, Well No. 14; the Ramirez-Guzman Unit Lease,
Well No. 7; and the Guzman-Ramirez Lease, Well No. 8, and assessed Strata and Epps, individually,
an administrative penalty of $8,000. Another November 9 order (docket number XX-XXXXXXX)
required Strata, Epps, and Brandes, individually, to plug the Salinas Lease, Well Nos. 1, 2, and 4. 
The order also assessed an administrative penalty against all three appellants, individually, in the
amount of $6,000. In its final November 9 order (docket number XX-XXXXXXX), the Commission
required Strata, Epps, and Brandes, individually, to plug the Oliveira Lease, Well Nos. 1, 2A, 3, and
4, and assessed an administrative penalty in the amount of $8,000. Each of the orders gave
appellants thirty days to comply with its terms. Appellants neither filed motions for rehearing nor
complied with any of the four orders.

 After issuing these orders, the Commission approached the owner of the land on
which the Salinas No. 4 and Oliveira No. 4 were located. At the request of the landowner, the
Commission took over and reconditioned these wells and converted them into water wells. Epps
testified that he was not notified of the Commission's action with respect to these wells.

 On October 18, 2001, the State brought suit against Strata, Epps, and Brandes under
the natural resources code to enforce its orders. See Tex. Nat. Res. Code Ann. § 89.043(a)
(West Supp. 2007). The State sought administrative and civil penalties for failure to comply with
the orders to plug abandoned wells. The State also sought reimbursement for well-plugging costs,
prejudgment interest, attorney's fees, and court costs. In addition, the State asked the trial court for
an injunction requiring appellants to plug their remaining wells or otherwise bring those wells into
compliance with Commission rules.

 On August 3, 2003, while the suit was pending, Epps filed for Chapter 13 bankruptcy. 
According to Epps, the Commission was given notice of the bankruptcy, appeared at the hearing, and
filed a claim for administrative penalties. On September 10, 2004, Epps's case was converted from
a Chapter 13 bankruptcy case to a Chapter 7 bankruptcy case. Epps was discharged from Chapter 7
bankruptcy on December 27, 2004.

 On December 15, 2005, following Epps's discharge from bankruptcy, the district 
court heard evidence and arguments in the case. Following trial, the court rendered judgment
imposing $14,000 in administrative penalties, $10,000 in civil penalties, and $36,863.20 in
reasonable plugging expenses jointly and severally from Strata, Epps, and Brandes. This portion of
the judgment reflected penalties and reimbursement expenses imposed regarding the Salinas and
Oliveira wells. (3) Strata, Epps, and Brandes were also ordered, jointly and severally, to plug the
Oliveira No. 3. The district court also imposed $12,000 in administrative penalties and $10,000 in
civil penalties jointly and severally from Strata and Epps in connection with the remaining two sets
of wells and enjoined Strata and Epps, jointly and severally, to plug the Q.K. Barber Well No. 1,
according to Commission rules. In addition, the court ordered that the State recover attorney's fees
in the amount of $7,500 and court costs in the amount of $343 jointly and severally from all
appellants. 

 The district court subsequently made findings of fact and conclusions of law. Strata,
Epps, and Brandes appealed.


DISCUSSION

Plugging cost reimbursement 

 In their first issue, appellants argue that the cost of plugging the wells was a pre-petition debt that was discharged by Epps's discharge from Chapter 7 bankruptcy. The State
disagrees. Additionally, the State brings a cross-point in which it urges that the plugging cost
reimbursement debt was not discharged in bankruptcy because the Commission had no notice
of the bankruptcy. 

 While Strata, Epps, and Brandes argue this issue collectively, only Epps filed for
bankruptcy and raised the affirmative defense of discharge. We also note that Epps's argument
regarding discharge is limited to his liability for plugging costs, not the administrative or civil
penalties. Consequently, this issue concerns only Epps's liability for plugging-cost reimbursement. 


 Discharge of pre-petition debt

 Under the bankruptcy code, whether a claim for payment of the type at issue in this
case is discharged depends on when that claim arose. The bankruptcy code defines a "claim" as a:


 (A) right to payment, whether or not such right is reduced to judgment,
liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,
undisputed, legal, equitable, secured, or unsecured; or 


 (B) right to an equitable remedy for breach of performance if such breach gives
rise to a right to payment, whether or not such right to an equitable remedy
is reduced to judgment, fixed, contingent, matured, unmatured, disputed,
undisputed, secured, or unsecured. 



11 U.S.C.A. § 101(5) (West Supp. 2008). As the statute explicitly states, whether a claim is
unliquidated, contingent, unmatured, or unsecured is immaterial. The bankruptcy code requires only
that the elements giving rise to liability occurred before the bankruptcy petition was filed.

 Congress intended a broad construction of the term "claim" to permit the broadest
possible relief in bankruptcy court. Johnson v. Home State Bank, 501 U.S. 78, 83-86 (1991); In re
National Gypsum, 139 B.R. 397, 405 (Bankr. N.D. Tex. 1992). As the National Gypsum court
observed:


 The legislative history of the Code reflects Congress' intent that the term "claim" be
given broad interpretation so that all legal obligations of the debtor, no matter how
remote or contingent will be able to be dealt with in the bankruptcy case. The courts
accordingly have given a broad and expansive reading to the term "claim."



National Gypsum, 139 B.R. at 405 (internal citations omitted). Thus, courts must look to
the earliest possible date upon which a claim may arise, so as to maximize the scope of a discharge. 
Id. at 404-09. 

 Whether a claim is a pre-petition claim requires an examination of the underlying
substantive law. Id. at 405. At issue here are provisions of the natural resources code governing the
plugging and replugging of oil and gas wells. The legislature authorized the Commission to plug
or replug oil and gas wells in certain circumstances:


 (a) If the commission determines at a hearing under Section 89.041 of
this code that a well has not been properly plugged or needs
replugging, the commission, through its employees or through a
person acting as agent for the commission, may plug or replug the
well if:

 

 (1) the well was properly plugged according to rules in effect at the time
the well was abandoned or ceased to be operated; or

 

 (2) neither the operator nor nonoperator properly plugged the well, and 
 

 (A) neither the operator nor nonoperator can be found; or 
 

 (B) neither the operator nor nonoperator has assets with which to
properly plug the well.



Tex. Nat. Res. Code Ann. § 89.043(a). After the Commission plugs or replugs a well under section
89.043(a), the Commission may order the operator to reimburse plugging costs and may enforce its
order by filing suit, and:


 (3) if the commission plugs the well, the commission: 

 

 (A) by order may require the operator to reimburse the commission for
the plugging costs; or


 (B) may request the attorney general to file suit against the
operator to recover those costs;



Id. § 89.043(c)(3). Thus, it is only after the Commission plugs a well that the Commission may
order reimbursement for plugging costs from the well operator. In other words, the cause of action
is not ripe until the Commission actually plugs the well. See id. § 89.083(f) (West Supp. 2007) ("If
the commission plugs a well under Sections 89.043 through 89.044 of this code, the state has a cause
of action for all reasonable expenses incurred in plugging or replugging the well and not recovered
under Section 89.085 of this code or through reimbursement to the commission.") (emphasis added).

 Epps argues that, under the natural resources code, even if the State's reimbursement
claim was not ripe before Epps filed his bankruptcy petition, the State's contingent claim arose for
bankruptcy purposes when Strata failed to comply with the Commission's plugging orders, thirty
days after the orders were issued. To support its argument, Epps relies chiefly on National Gypsum. 
139 B.R. 397. The issue in National Gypsum was whether future environmental response and
resource damage costs under the Comprehensive Environmental Response, Compensation, and
Liability Act (CERCLA) (4) were "claims" within the meaning of the bankruptcy code. Id. at 403. 
According to the court, "[a] claim exists only if before filing of the bankruptcy petition, the
relationship between the debtor and the creditor contained all the elements necessary to give rise to
a legal obligation--'a right to payment'--under the relevant non-bankruptcy law." Id. at 405. Even
if the claims under the applicable statutory provisions are not yet ripe for adjudication at the time the
bankruptcy petition is filed, as long as "all the elements that can give rise to liability" have occurred
pre-petition, the claim is a pre-petition claim that is discharged in bankruptcy. Id. 

 Similar to the claims at issue here, the CERCLA claims in National Gypsum were not
ripe until after the cleanup. "Liability is not assessed until after the EPA has investigated a site,
decided what remedial measures are necessary, and determined which potentially responsible persons
will bear the costs." Id. (quoting In re Combustion Equip. Assoc., Inc., 838 F.2d 35, 37
(2d Cir. 1988)). Although the amount of the claim may be unknown pre-petition, in light of an
underlying statutory scheme in which speedy remediation is promoted by requiring cleanup before
suit can be brought for reimbursement and in light of Congress's intent that the term "claim" be
given a broad interpretation, the court ultimately held that "all future response and natural resource
damages costs based on pre-petition conduct that can be fairly contemplated by the parties at the time
of Debtors' bankruptcy are claims under the Code." Id. at 409. 

 Other cases interpreting the interplay between environmental cleanup statutes and the
bankruptcy code also support Epps's position. For example, addressing the interplay between the
bankruptcy code and CERCLA, some courts have applied a foreseeability analysis to determine at
what point CERCLA claims arose or were contingent. See, e.g., In re Chicago, Milwaukee, St. Paul
& Pac. R.R., Co., 974 F.2d 775 (7th Cir. 1992); Mesiti v. Microdot, Inc., 156 B.R. 113 (Bankr. N.H.
1993). A claim was foreseeable under CERCLA, for example, where parties knew that the
hazardous substance had been released, that response costs would be incurred, that such a hazardous
release likely fell within the purview of CERCLA, and that derailment of the debtor's train had
caused the hazardous release. Chicago, 974 F.2d at 787. Though still a contingent claim, the
bankruptcy debtor could be tied to a known release of hazardous substances; therefore, the claim had
arisen under CERCLA at the time of bankruptcy. Id. at 786. 

 The Fifth Circuit has employed a similar analysis in its interpretation of the interplay
between the bankruptcy code and environmental statutes. For example, addressing an environmental
liability claim against the debtor, the Fifth Circuit affirmed the bankruptcy court's determination that,
because the claimant became aware of the hazardous release before the close of the bankruptcy case
and because the claimant had information that would allow a connection to be made between the
debtor and the hazardous release, the claim arose pre-petition. In re Crystal Oil Co., 158 F.3d 291,
296-97 (5th Cir. 1998). 

 The Fifth Circuit has also adopted a similar test for non-environmental claims,
interpreting the term "claim" broadly in favor of discharge. Attempting to define the scope of
"claim" in considering whether a claim for tort liability arose pre-petition, the court explained that
"a claim arises at the time of the debtor's negligent conduct forming the basis for liability only if the
claimant had some type of specific relationship with the debtor at that time." Lemelle v. Universal
Mfg. Corp., 18 F.3d 1268, 1276 (5th Cir. 1994). Applying this test, the court held that the tort-liability claim did not arise pre-petition because the injury occurred three years after the bankruptcy
petition was filed and no pre-petition relationship had existed between the parties. Id. at 1277. 

 In another case, the Fifth Circuit reviewed certain state court claims against the
claimant's ex-husband to determine whether those claims arose pre- or post-petition. In re Egleston,
448 F.3d 803, 812-14 (5th Cir. 2006). The state court settlement order between the parties had
ordered the ex-husband to pay alimony to the ex-wife. Id. at 805. Six months later, the ex-husband
filed for bankruptcy. Id. He then failed to make some of the alimony payments and was held in
contempt of court. Id. at 806-07. Unable to pay her bills without the alimony payments, the ex-wife
lost both her home and her car. Id. at 807. A state court again found the ex-husband in contempt
and, among other things, ordered him to pay certain sums to compensate his ex-wife for her lost
house and car. Id. Affirming the judgment of the lower courts, the Fifth Circuit held that the
portions of the state court judgment at issue arose pre-petition and, therefore, represented the ex-husband's liability for discharged debt. Id. at 812-14. The court reasoned that the state court awards
had been made to compensate the ex-wife for her loss of the house and the vehicle and that she had
been unable to continue making payments as a direct result of her ex-husband's failure to make
alimony payments. Id. at 813. The ex-husband had breached his obligation to make payments pre-petition. Id. In addition, foreclosure proceedings on the house had begun pre-petition, and the car
was "up for repossession" pre-petition. Id. Although the debts had not matured pre-petition, they
arose pre-petition and were, therefore, discharged under the bankruptcy code's "broad definition of
'claim.'" Id. at 814. 

 The cases cited by the State to support its position that the claim did not exist at the
time the bankruptcy petition was filed are unpersuasive. In one case, the issue was whether an action
of the Department of Environmental Resources (DER) was an action to enforce a money judgment
under section 362(b)(5) of the bankruptcy code and, therefore, an action subject to the automatic
stay. Penn Terra, Ltd. v. Department of Envtl. Res., 733 F.2d 267, 272 (3d Cir. 1984). Contrary to
the State's interpretation, the court in Penn Terra determined whether the actions of the DER were
an attempt to enforce a money judgment; the court did not determine whether a pre-petition order
to take environmental correction actions constituted a "claim" under section 101(5). Id. The court
concluded that the suit brought by DER was brought as an equitable action to prevent future harm,
not as an action to enforce a "money judgment" because a money judgment must result in the
"adjudication of liability for a sum certain." Id. at 275-78. Thus, according to the court, the "police
powers" exception to the automatic stay provision found in section 362(b)(5) was applicable. (5)
 
Id.  at 278-79. The court did not address what constitutes a "claim" under section 101(5). See
id. at 274-79. 

 In another case cited by the State, the issue was, similarly, whether the EPA's
enforcement action against Commonwealth qualified as the enforcement of a money judgment
under section 362(b)(5) of the bankruptcy code. Commonwealth Oil Ref. Co. v. EPA, 805 F.2d 1175
(5th Cir. 1986). The State correctly states the court's holding that the EPA's order was an exercise
of the EPA's police or regulatory powers and not an action to enforce a money judgment; therefore,
the automatic stay did not apply to the EPA's actions. This holding, however, has no application to
the present case.

 In the third case cited by the State to support its position, the issue was whether the
automatic stay provision applied where the debtor's acts occurred pre-petition but the resulting cause
of action arose post-petition. In re M. Frenville Co., 744 F.2d 332, 333 (3d Cir. 1984). A&B, a
certified public accounting firm, had been engaged by M. Frenville Co., Inc., as an independent
auditor and accountant and, in this capacity, prepared financial statements for Frenville. Creditors
of Frenville filed an involuntary petition in bankruptcy against Frenville. Id. Several banks also
filed suit against A&B, alleging that the financial statements had been negligently and recklessly
prepared. Id. A&B sought to include Frenville in this proceeding to obtain indemnification or
contribution from Frenville for any loss suffered by A&B as a result of the banks' suit. Id. at 333-34. 
The bankruptcy judge, however, refused to lift the automatic stay, which barred A&B's action for
indemnification and contribution. Id. at 334. 

 According to the court, the applicability of the automatic stay depended on whether
the claim arose pre-petition or post-petition. Id. at 336. More specifically, the determination to be
made was at what point the claimant had a right to payment for indemnity or contribution. Id. Under
New York law, a third-party complaint for contribution or indemnity may only be brought after the
defendant (A&B) serves his answer in the suit brought by the plaintiff (the banks). Id. at 337. A
claim for contribution or indemnification does not accrue at the time of Commission of the
underlying act but at the time of payment of the judgment stemming from a claim on the underlying
act. Id. at 337. Thus, before suit was brought by the banks, A&B had no claim or cause of action
against Frenville. Id. at 337. A&B would only have a right to payment from the banks if A&B were
found liable to the banks. Id. Therefore, once suit was brought by the banks, even before A&B filed
its answer, A&B would have an unmatured, unliquidated, disputed claim. (6) Id. At the time the
bankruptcy petition was filed, the banks had not filed suit; therefore, A&B had no claim against
Frenville. Id.

 Here, the State is in a position analogous to the banks in Frenville. It is the State that
has the right to bring suit against Epps, not some other third party. The State had a right to payment
thirty days after Epps failed to comply with Commission orders even though its claim had not yet
been filed and was, therefore, unmatured, unliquidated, and disputed. Under section 101(5),
however, even though the claim was unmatured, unliquidated, and disputed, the elements giving rise
to liability occurred before the bankruptcy petition was filed. Consequently, the State's claim arose
pre-petition. See 11 U.S.C.A. § 101(5).

 We note that all three cases cited by the State interpret the automatic stay provisions
of the bankruptcy code. To the extent that those provisions apply here, they support Epps's rather
than the State's position. Section 362 requires that the filing of a petition in bankruptcy operates as
a stay of:


 the commencement or continuation, including the issuance or employment of
process, of a judicial, administrative, or other proceeding against the debtor that was
or could have been commenced before the commencement of the case under this title,
or to recover a claim against the debtor that arose before the commencement of the
case under this title



11 U.S.C.A. § 362(a)(1) (West Supp. 2008) (emphasis added). The automatic stay would apply to
the State's claim, as the claim "could have been commenced" thirty days after Strata failed to comply
with the Commission's orders of September and November 2000. Conversely, in Frenville, for
example, the claim at issue was an action for indemnity. 744 F.2d at 335. Under New York law,
the claim could not be filed until the defendant served his answer in the suit brought by the plaintiff. 
Id. The suit was not initiated by plaintiffs until fourteen months after bankruptcy was filed;
therefore, the automatic stay did not apply. Here, however, the State could have plugged the wells
and then filed its claim for indemnity at any time following thirty days of Strata's noncompliance
with the Commission's order. 

 Broadly summarizing its arguments, the State asserts that "[i]n Texas, unlike other
federal environmental laws, the right to payment does not come into existence when the violation
occurs; rather, in Texas, the Commission's right to payment only exists if and only if the
Commission plugs or replug [sic] a well." In essence, the State is arguing that the underlying
substantive federal and state and state environmental laws operate differently despite the similarities
in procedures by which reimbursement claims arise and are filed. The State, however, cites no
authority for this proposition, and the cases cited and discussed above in support of this proposition
either do not apply or offer no support for the State's position.

 We conclude that the State's claim arose before the bankruptcy was filed and,
therefore, assuming the State had notice of the claim, the reimbursement claim against Epps should
have been discharged in his bankruptcy. Accordingly, we sustain Epps's first issue. 


 Notice

 Under section 523(a)(3) of the bankruptcy code, "Exceptions to Discharge," a debtor
is not discharged from any debt that is:


 (3) neither listed nor scheduled under section 521(1) of this title, with the name,
if known to the debtor, of the creditor to whom such debt is owed, in time to
permit-- 


 (A) if such debt is not of a kind specified in paragraph (2), (4), or (6) of
this subsection, timely filing of a proof of claim, unless such creditor
had notice or actual knowledge of the case in time for such timely
filing; or 


 (B) if such debt is of a kind specified in paragraph (2), (4), or (6) of this
subsection, timely filing of a proof of claim and timely request for a
determination of dis-chargeability of such debt under one of such
paragraphs, unless such creditor had notice or actual knowledge of the
case in time for such timely filing and request


11 U.S.C.A. 523(a)(3) (West Supp. 2008). Here, there is no evidence, and Strata does not assert, that
the plugging expenses reimbursement claim was a listed or scheduled debt. (7) Consequently,
discharge here turns on whether the State had "notice or actual knowledge of the case in time for"
timely filing of a proof of claim and timely request for a determination of dischargeability. The
district court found that "[t]he Commission had notice or actual knowledge of the bankruptcy of
Stephen Bland Epps." 

 In its cross-point, the State argues that the plugging-cost reimbursement liability could
not have been discharged in Epps's bankruptcy because the evidence is insufficient to support the
trial court's finding that the State had notice of the bankruptcy proceeding. In reply, Epps argues that
the State had the burden of proof on this issue but failed to present any evidence to prove that it had
no notice. Further, according to Epps, even if Epps had the burden of proof on the notice issue, the
record contains sufficient evidence to support the court's judgment. 

 Discharge in bankruptcy is an affirmative defense. Tex. R. Civ. P. 94; In re Haga,
131 B.R. 320, 327 (Bankr. W.D. Tex. 1991); In re Anderson, 72 B.R. 495, 496 (Bankr. Minn. 1987).
The affirmative defense of discharge establishes a prima facie defense to any claim brought against
the debtor for a pre-petition debt. In re Haga, 131 B.R. at 327. It is the debtor's burden to establish
discharge, and as part of its burden, the debtor must show that the creditor had notice or actual
knowledge of the case in time to file a proof of claim and request for a determination of
dischargeability. Id.; Walters v. Hunt, 146 B.R. 178, 183 (Bankr. W.D. Tex. 1992). Thus, Epps has
the burden of showing that the State had notice or actual knowledge of the case in time to file a proof
of claim and request for determination of dischargeability.

 When a party challenges the legal sufficiency of the evidence supporting an adverse
finding on an issue on which it does not have the burden of proof, that party must demonstrate on
appeal that there is no evidence to support the adverse finding. Croucher v. Croucher, 660 S.W.2d
55, 58 (Tex. 1983). In reviewing a no evidence point, we consider all of the evidence in the light
most favorable to the prevailing party, indulging every reasonable inference in that party's favor.
Associated Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 285-86 (Tex. 1998). If there
is more than a mere scintilla of evidence to support the finding, the evidence is legally sufficient, and
we will overrule the issue. Haggar Clothing Co. v. Hernandez, 164 S.W.3d 386, 388 (Tex. 2005). 
When the evidence of a vital fact is "so weak as to do no more than create a mere surmise or
suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no
evidence." Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004) (quoting Kindred
v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983)).

 The State maintains that, pursuant to section 523(a)(3), there is no evidence that it
had notice of the bankruptcy proceedings. Further, even if there is evidence of notice, the State
argues, there is no evidence establishing when the proceeding occurred, and it was Epps's burden
to establish that the State had "notice or actual knowledge of the case in time for such timely filing
and request." See 11 U.S.C.A. § 523(a)(3)(B). Therefore, according to the State, Epps cannot be
discharged from its debt for plugging costs. 

 Although the State is correct that no evidence establishes when the referenced
proceeding occurred and whether such proceeding occurred in time to allow the State to timely file
its claim, the State conceded in its post-trial brief that it had, indeed, filed a claim in the bankruptcy
proceeding initiated by Epps's August 3, 2003 bankruptcy petition:


 Plaintiff's claim for administrative penalties is nondischargeable
under federal bankruptcy law. Defendant Steven Bland Epps filed for
bankruptcy protection on August 3, 2003 in the United States
Bankruptcy Court for the Southern District of Texas. The
Commission filed a claim for $22,800.00 in administrative penalties
as an unsecured nonpriority claim.


In so stating, the State has conceded that it had actual notice of the bankruptcy sufficient to allow
it to file its claim before the deadline. See 11 U.S.C.A. 523(a)(3)(B). (8)

 Viewing the evidence of notice in the light most favorable to the judgment, we
conclude that there was sufficient evidence to support the district court's finding that the State had
notice or actual knowledge of Epps's bankruptcy. See City of Keller, 168 S.W.3d at 829-30. 
Accordingly, we overrule the State's cross-point and hold that Epps's liability for plugging-expense
reimbursement was discharged in his bankruptcy.


Water-well conversions of Salinas No. 4 and Oliveira No. 4 

 As Epps's liability for plugging-cost reimbursement was discharged in his
bankruptcy, appellants' remaining challenges to the plugging-cost reimbursement award concern
only Brandes and Strata. In their second issue, appellants argue that they should not be responsible
for the plugging costs on the Salinas No. 4 and the Oliveira No 4 because the State converted the
wells to water wells for the benefit of the landowner without notice to appellants. These actions,
appellants maintain, violated the Commission's own rules and preclude the State from charging the
cost of conversion to appellants. The State responds that, even if the Commission converted the
wells to water wells without giving notice to appellants, the State's claim for plugging cost
reimbursement is unaffected.

 Commission rules allow it to plug dry or inactive wells in the following
circumstances:


 (A) After notice and hearing, if the well is causing or is likely to cause the
pollution of surface or subsurface water or if oil, gas, or other formation fluid
is leaking from the well, and: 

 

 (i) Neither the operator nor any other entity responsible for plugging the
well can be found; or 

 

 (ii) Neither the operator nor any other entity responsible for plugging the
well has assets with which to plug the well. 


 (B) Without a hearing if the well is a delinquent inactive well and: 

 

 (i) the Commission has sent notice of its intention to plug the well as
required by §89.043(c) of the Texas Natural Resources Code; and 

 

 (ii) the operator did not request a hearing within the period (not less than
10 days after receipt) specified in the notice. 

 

 (C) Without notice or hearing, if: 

 

 (i) The Commission has issued a final order requiring that the operator
plug the well and the order has not been complied with; or 

 

 (ii) The well poses an immediate threat of pollution of surface or
subsurface waters or of injury to the public health and the operator
has failed to timely remediate the problem. 



16 Tex. Admin. Code § 3.14(b)(4) (2007). If state funds are expended for the above plugging
operations, "the Commission may seek reimbursement from the operator and any other entity
responsible for plugging the well." Id. § 3.14(b)(5). This was the basis for the plugging
reimbursement claims against appellants. 

 Here, the Commission plugged the wells pursuant to section 3.14(b)(4)(C)(i). See
id. § 3.14(b)(4)(C)(i). The Commission issued orders requiring that appellants bring the Salinas and
Oliveira wells into compliance or plug them. It is undisputed that appellants did not comply with
these orders. Therefore, the State was authorized to plug these wells pursuant to
section 3.14(b)(4)(C)(i). See id. 

 Commission rules also specify general requirements for plugging. Id. § 3.14(d). 
These rules provide that when a well is converted to a water well, the operator must plug the well
up to the base of the usable quality water strata. See id. § 3.14(a)(4)(A). Further, Mark England,
an engineering specialist for the field operation section of the Commission's oil and gas section,
testified that plugging the wells by converting them into water wells cost the State less than
completely plugging the wells. 

 The crux of appellants' argument is that while the Commission had the right to seek
reimbursement for fully plugging the wells, the Commission cannot recover those costs if it plugs
the well in a manner allowing it to be used as a water well--even when doing so would cost the State
less than fully plugging the well, and yield the added benefit of a water well. We find no support
for appellants' contention. We conclude that the Commission plugged the Salinas No. 4 and
Oliveira No. 4 consistent with the requirements of sections 3.14(b)(4) and (5) of its rules. The fact
that the Commission's method of plugging also provided a benefit to the landowner by converting
the wells into water wells has no bearing on the State's ability to "seek reimbursement from the
operator and any other entity responsible for plugging the well," and appellants cite no authority
indicating otherwise. See id. 3.14(b)(5). Accordingly, we overrule appellants' second issue. 


Salvage of equipment 

 In appellants' third issue, they argue that they are not liable for the costs of plugging
the Salinas Well Nos. 1 and 2 and the Oliveira Well Nos. 1 and 2A because the State failed to prove
certain reimbursement amounts--specifically, the value of wellsite equipment that the Commission
salvaged--that appellants are entitled to offset against plugging costs. The State responds that the
natural resources code allows, but does not require, such an offset and that to challenge the value of
the offset, appellants were required to make a claim on the oil-field cleanup fund under section
89.086 of the code. See Tex. Nat. Res. Code Ann. § 89.086 (West Supp. 2007).

 Appellants' argument is essentially an evidentiary-sufficiency challenge: 


 The State did not meet its burden of proof by a preponderance of the evidence that
the plugging costs for those wells identified in State Exhibit 5, for which the trial
court awarded judgment for reimbursement, complied with the requirements of
§ 89.083(f); that is, the plugging costs incurred by the State, less properly priced
wellsite equipment sold by the Railroad Commission at the statutory value.



Appellants dispute the State's contention that wellsite equipment sold by the State to offset
reimbursement costs was sold at the generally recognized market value. At trial, Epps testified as
to his opinion of the generally recognized market value, which, in his view, was "greatly in excess"
of the salvage price set by the Commission. 

 Read together, sections 89.083(f) and 89.085 of the natural resources code allow the
Commission to offset reimbursement costs with proceeds from the sale of equipment:


 (f) If the commission plugs a well under Sections 89.043 through 89.044 of this
code, the state has a cause of action for all reasonable expenses incurred in
plugging or replugging the well and not recovered under Section 89.085 of
this code or through reimbursement to the commission.


Tex. Nat. Res. Code Ann. § 89.083(f). To the extent that the Commission decides to dispose of well
equipment, section 89.085 requires it to do so "in a commercially reasonable manner" to cover
plugging costs: 


 (a) When the commission forecloses its lien under Section 89.083 on a
delinquent inactive well, well-site equipment and any amount of
hydrocarbons from the well that is stored on the lease are presumed to have
been abandoned and may be disposed of by the commission in a
commercially reasonable manner by either or both of the following methods:


 (1) entering into a plugging contract that provides that the person
plugging or cleaning up pollution, or both, will take title to well-site
equipment, hydrocarbons from the well that are stored on the lease,
or hydrocarbons recovered during the plugging operation in exchange
for a sum of money deducted as a credit from the contract price; or


 (2) selling the well-site equipment, hydrocarbons from the well that are
stored on the lease, or hydrocarbons recovered during the plugging
operation at a public auction or a public or private sale.



Id. § 89.085(a) (West Supp. 2007). Further, 


 The commission shall dispose of well-site equipment or hydrocarbons under this
section at a price or value that reflects the generally recognized market value of the
equipment or hydrocarbons, with allowances for physical condition.



Id. § 89.085(c). According to appellants, "[t]he evidence is undisputed that the Commission
disposed of wellsite equipment, State Ex. 5, but not at the price or value required by statute." (9) 

 The district court concluded that "[t]he reasonableness of the amounts for which
salvaged equipment was sold is irrelevant to Strata Resources, Steven Bland Epps, and
Charles W. Brandes's liability for state funds spent to plug the wells in question." At trial and on
appeal, the State has argued that the exclusive means of asserting rights to proceeds of well
equipment sales is not section 89.083 or section 89.085, as appellants assert, but in the statutes
governing claims against the oil-field cleanup fund. See id. § 89.086. Because such proceeds are
deposited in the oil-field cleanup fund, the State maintains that the claimant must file his claim
against the fund pursuant to section 89.086:


 A person with a legal or equitable ownership or security interest in well-site
equipment or hydrocarbons disposed of under Section 89.085 of this code may make
a claim against the oil-field cleanup fund . . . .



Id. § 89.086(a). In addressing such a claim, the Commission may conduct a hearing to receive
evidence. Id. § 89.086(e). If the claimant is not satisfied with the Commission's decision on such
a claim, he may appeal to the Travis County district court. Id. § 89.087(a) (West 2001).

 As the statutory scheme for making a claim on the oil-field cleanup fund is separate
and independent from the Commission's claim for reimbursement of plugging costs, we hold that
the district court was correct in concluding that "[t]he reasonableness of the amounts for which
salvaged equipment was sold is irrelevant." To challenge the value the Commission obtained when
disposing of their wellsite equipment, appellants were required to make a claim on the oil-field
cleanup fund pursuant to section 89.086. Appellants made no such claim. Accordingly, we overrule
appellants' third issue. 


Civil Penalties 

 In their fourth issue, appellants challenge the district court's judgment imposing civil
penalties against them. The civil penalties were based on section 85.381 of the natural
resources code:

 (a) In addition to being subject to any forfeiture provided by law and to any
penalty imposed by the commission for contempt for violation of its rules or
orders, any person who violates the provisions of Sections 85.045 and 85.046
of this code, Title 102, Revised Civil Statutes of Texas, 1925, as amended,
including provisions of this code formerly included in that title, or any rule
or order of the commission promulgated under those laws is subject to a
penalty of not more than:

 

 (1) $10,000 when the provision, rule, or order pertains to safety
or the prevention or control of pollution; or

 

 (2) $1,000 when the provision, rule, or order does not pertain to
safety or the prevention or control of pollution.

 

 (b) The applicable maximum penalty may be assessed for each and every day of
violation and for each and every act of violation. 



Tex. Nat. Res. Code Ann. § 85.381 (West 2001). The district court imposed civil penalties of
$5,000 for appellants' violations of the administrative orders regarding each of the four groups of
wells at issue. Consequently, it imposed a total of $20,000 in penalties--$10,000 of which Strata,
Epps and Brandes were jointly and severally liable, and another $10,000 for which only Strata and
Epps were jointly and severally liable. 

 Appellants contend that legally and factually insufficient evidence supports the
district court's civil penalties award because the court made no finding of the precise number of days
for which they were in violation of each of the administrative orders.

 It is undisputed that none of the appellants complied with any of the four orders prior
to trial. Based on the date of the orders and the date of trial, the orders that implicated only Strata
and Epps were violated for a total of 3,722 days, while the orders that also implicated Brandes were
violated for total of 16,488 days. (10) Thus, there is evidence in the record that Brandes was in
violation of Commission orders for a total of 16,488 days while Strata and Epps were in violation
of Commission orders for a total of 20,210 days. 

 When a trial court finds one or more elements of a ground of recovery or defense,
omitted elements "will be supplied by presumption in support of the judgment" if supported by the
evidence. Tex. R. Civ. P. 299. The district court was authorized, based on the number of days the
evidence showed each appellant was in violation and the statutory per-day maximums for civil
penalties, to impose civil penalties for as much as $202,100,000 for Strata and Epps and
$164,880,000 for Brandes. The district court's assessment of penalties of $20,000 for Strata and
Epps and $10,000 for Brandes is, thus, well within the range of its authority and the evidence. Having found the evidence sufficient to support the trial court's award of civil
penalties, we overrule appellants' fourth issue. (11) 

 

Attorney's fees 

 In their fifth issue, appellants challenge the district court's award of $7,500 in
attorney's fees, imposed jointly and severally against Strata, Epps, and Brandes. Appellants argue
that there is insufficient evidence of the reasonableness or necessity of the fees. Relatedly,
appellants complain that the State failed to segregate its attorney's fees incurred in prosecuting
claims for which fees were recoverable from those in which fees were not recoverable. 

 The State presented the following evidence of its attorney's fees: 



 During its four-year pendency of the case prior to trial (October 18, 2001
through December 15, 2005), seven attorneys represented the State. 


 


 In total, State attorneys spent a total of 127 hours on the case. 


 


 State attorneys served no discovery on appellants. 


 


 The trial attorney, who had been practicing for one and one-half years, had
a billing rate of $150 per hour. 


 


The State, however, did not segregate its attorney's fees between claims or defendants. The State
asserted different claims against Epps and Brandes in which it could recover attorney's fees. The
State could recover administrative and civil penalties against Epps in connection with all four groups
of wells, but against Brandes regarding only two groups of wells. Conversely, while the State was
entitled to recover well-plugging expenses against Brandes, we have held that such expenses were
not recoverable against Epps. 

 A claimant is required to segregate attorney's fees between claims for which
attorney's fees are recoverable and those for which fees are not recoverable. Tony Gullo Motors
v. Chapa, 212 S.W.3d 299, 313 (Tex. 2006). It is only when legal services advance both recoverable
and unrecoverable claims that the services are so intertwined that the associated fees need not be
segregated. Id. at 313-14. Here, the claims for civil penalties, administrative penalties, and
reimbursement of well-plugging expenses were separate and distinct. To prove its claim for civil
penalties, the State needed only to prove that appellants failed to comply with Commission orders. 
To prove its claim for reimbursement costs, however, the State needed to show that it had plugged
the wells and incurred plugging costs in compliance with the natural resources code. The State was
also required to address Epps's affirmative defense that his claims for reimbursement had been
discharged in bankruptcy. Indeed, the record shows that most of the trial focused on the State's
reimbursement claim rather than the State's claim for civil penalties. Although the claims are not
necessarily "so intertwined" that they could not have been segregated, the State's fee entries include
only general entries, such as "reviewing/researching file(s)" and "conferring with agency personnel." 
See id.; Owens v. Ousey, 241 S.W.3d 124, 134 (Tex. App.--Austin 2007, pet. denied). Based on
the evidence, we cannot conclude that there is sufficient evidence that the amount of attorney's fees
for which each appellant was held jointly and severally liable--$7,500--was reasonable. We,
therefore, remand to the district court to segregate and award attorney's fees based only on the
State's recoverable claims against each appellant. See Owens, 241 S.W.3d at 134 (remanding
because evidence of attorney's fees for entire case is some evidence of what amount of segregated
fees should be). To this extent, we sustain appellants' fifth issue.


CONCLUSION

 We reverse the district court's judgment awarding the State reimbursement from Epps
for well-plugging costs. We remand the case to the district court for further proceedings regarding
the amount of attorney's fees imposed against each appellant. We otherwise affirm the district
court's judgment. 


 __________________________________________

 Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed in part; Reversed and Rendered in part; Reversed and Remanded in part

Filed: July 11, 2008


1. A form P-4 is a Producer's Transportation Authority and Certificate of Compliance.
2. For convenience, we cite to the current versions of statutes and rules except where language
in the prior version affects our analysis or the outcome. 


 Rule 3.58(a) provides:


 The Commission form P-4 establishes the operator of an oil lease, gas well, or other
well; certifies responsibility for regulatory compliance, including plugging wells in
accordance with §3.14 of this title (relating to plugging); and identifies gatherers,
purchasers, and purchasers' commission-assigned system codes authorized for each
well or lease. Operators shall file form P-4 for new oil leases, gas wells, or other
wells; recompletions; reclassifications of wells from oil to gas or gas to oil;
consolidation, unitization or subdivision of oil leases; or change of gatherer, gas
purchaser, gas purchaser system code, operator, field name or lease name. 
3. These amounts, according to the district court's subsequent findings of fact and conclusions
of law, represented $17,705.70 in plugging expenses, $6,000 in administrative penalties, and $5,000
in civil penalties related to the Salinas wells; and $19,157.50 in plugging expenses, $8,000 in
administrative penalties, and $5,000 in civil penalties related to the Oliveira wells. 
4. Under CERCLA, private parties that incur costs in cleaning up hazardous substances may
bring suit against certain statutorily defined responsible parties to recoup those costs. 42 U.S.C.A.
§ 9607(a)(4)(B) (West 2005).
5. Section 362(b)(5) provides: 


 (b) The filing of a petition under section 301, 302, or 303 of this title does not
operate as a stay

 

 (5) under subsection (a)(2) of this section, of the enforcement of a
judgment, other than a money judgment, obtained in an action or
proceeding by a governmental unit to enforce such governmental
unit's police or regulatory power


11 U.S.C.A. § 362(b)(5) (West Supp. 2008). 

6. The court emphasized that, had an indemnity contract existed between the banks and
A&B, A&B would have had a contingent right to payment even before the banks filed suit; however,
no such contract existed in this case. In re M. Frenville Co., 744 F.2d 332, 337 (3d Cir. 1984).
7. Although Strata's Exhibit 5 appears to show that Strata listed the State as a creditor under
the name of Ronald R. DelVento, who was the chief of the Bankruptcy and Collections Division at
the Attorney General's Office, there is no evidence that any debts to the State were scheduled. 
8. Epps also presented some evidence of the filing of his Chapter 13 bankruptcy petition on
August 3, 2003, later conversion to a Chapter 7 case on September 10, 2004, and entry of an order
of discharge on December 27, 2004. When asked whether, during the bankruptcy proceeding which
is shown by Exhibits 4 and 5, a representative of the Commission appeared at any of the hearings
held in that proceeding, Epps responded in the affirmative. Specifically, Epps responded that
Guy Grossman, the director for District 3, had attended the bankruptcy proceedings. He further
testified that, to his knowledge, the Commission was "fully aware of what was going on."
9. In their initial brief, appellants also argued that the Commission failed to account for all
equipment. However, in their reply brief, appellants concede that "[t]he evidence is undisputed that
the Commission disposed of wellsite equipment, State Ex. 5, but not at the price or value required
by statute." We, therefore, address only the "price or value" for which the equipment was sold.
10. The calculations are as follows:


September 12, 2000: issued for one well, Q.K. Barber, Well No. 1, for failure to pay administrative
penalty; implicates Strata and Epps; 1,890 days of violation (from the 30 days after the date of the
order, September 12, 2000 to the date of trial, December 15, 2005).


November 9, 2000 order 1: issued for four wells, Guzman, Well No. 12, Ramirez, Well No. 14,
Ramirez Guzman, Well No. 7, and Guzman-Ramirez, Well No. 8, for failure to pay administrative
penalty; implicates Strata and Epps; these wells were brought into compliance by Strata on
December 9, 1999; 1832 days of violation for failure to pay $8,000 administrative penalty (from
30 days after the date of the order, November 9, 2000 to the date of trial, December 15, 2005);
1832 days of violation for each Strata and Epps.


November 9, 2000 order 2: issued for three wells, Salinas, Wells No. 1, 2, and 4; implicates Strata,
Epps, and Brandes; 1832 days of violation for each well for failure to plug or for failure to pay
reimbursement costs and 1832 days for failure to pay administrative penalty (from 30 days after the
date of the order, November 9, 2000 to the date of trial, December 15, 2005); 1832 times 4 equals
7,328 days of violation for each Strata, Epps, and Brandes.


November 9, 2000 order 3: issued for four wells, Oliveira, Wells No. 1, 2A, 3, and 4; implicates
Strata, Epps, and Brandes; 1832 days of violation for each well for failure to plug or for failure to
pay reimbursement costs and 1832 days for failure to pay administrative penalty (from 30 days after
the date of the order, November 9, 2000 to the date of trial, December 15, 2005); 1832 times 5 equals
9,160 days of violation for each Strata, Epps, and Brandes. 
11. Our disposition of appellants' issue renders moot the State's cross-point challenging the
district court's fact finding that State Exhibit 4, which contained both the administrative orders and
the State's calculations of the numbers of days of violation, "does not identify the number of days
of violation by Strata Resources, Steven Epps or Charles Brandes."